Reid KNUTSON, Plaintiff–Appellant,

v.

WISCONSIN AIR NATIONAL GUARD and Gerald D. Slack, Defendants–Appellees.

No. 92–1118.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 4, 1993.

Decided June 9, 1993.

Patrick Berigan (argued), Angermeier & Rogers, Milwaukee, WI, for Reid Knutson.

Nadim Sahar, Asst. Atty. Gen. (argued), Wisconsin Dept. of Justice, Milwaukee, WI, for Wisconsin Air Nat. Guard.

Nadim Sahar, Asst. Atty. Gen., Bruce D. Schrimpf, Wisconsin Dept. of Justice, Milwaukee, WI, for Gerald D. Slack.

Before POSNER, FLAUM, and KANNE, Circuit Judges.

FLAUM, Circuit Judge.

Reid Knutson was assigned to the Wisconsin Air National Guard ("WIANG") on October 16, 1983. In August of 1989, after serving various active and reserve guard ("AGR") tours, Colonel Knutson received orders extending his AGR tour from October 16, 1989 through October 15, 1994. This order contained the specific condition "unless sooner relieved by competent authority." At that time Knutson was serving as the Commander of the Civil Engineering Squadron of the 128th Air Refueling Group. On December 18, 1989, Knutson received a termination letter from Major General Raymond A. Matera, Adjutant General of WIANG.[1] This letter advised Knutson that the Adjutant General was considering the rescission of the AGR orders. In accordance with Chapter 6 of the Air National Guard Regulations ("ANGR") 35–03, Matera allowed Knutson until December 27, 1989 to rebut the proposed action. Knutson submitted a rebuttal letter to Matera in which he challenged the proposed termination and requested specific reasons for the action.

Subsequently, Colonel Eugene Schmitz forwarded to the appellant reasons for termination. Among the reasons documented were the failure to serve proper real estate documents necessary to complete a water main project, the failure to administer properly his command, the failure to produce a closure plan for a landfill problem, and gross fiscal mismanagement. Colonel Schmitz also attested that he had counseled Knutson on four separate occasions about his perfor-

1. Gerald D. Slack replaced Matera as Adjutant General on December 21, 1989.

mance. These counseling sessions addressed instances of drinking by those under his command, morale and administration difficulties, lack of adherence to the established chain of command, and favoritism. In his rebuttal letter, Knutson specifically denied each allegation; in addition, he alleged that he had been denied counsel, access to documents, and a termination hearing. WIANG terminated Knutson on February 28, 1990.

Knutson then filed this action in Milwaukee County Circuit Court, and WIANG removed it to the district court. In his amended complaint, Knutson alleged that his termination infringed on his liberty, property, and due process rights in violation of 42 U.S.C. § 1983, and requested injunctive relief, monetary damages, and reinstatement. In the district court, WIANG moved for summary judgment or, in the alternative, dismissal for lack of jurisdiction. The court dismissed the damages claim and granted summary judgment in favor of WIANG on the claims for injunctive relief.

## I.

■ A section 1983 suit presumes some form of state action. Whether WIANG in fact acted under color of state law poses a challenging question because of the hybrid nature of the National Guard. The Guard occupies a distinct role in the federal structure that does not fit neatly within the scope of either state or national concerns. In each state the National Guard is a state agency, under state authority and control. At the same time, federal law accounts, to a significant extent, for the composition and function of the Guard. Accordingly, the Guard may serve the state in times of civil strife within its borders while also being available for federal service during national emergencies.

Both parties initially argued that Knutson's status as a federal versus a state employee is relevant for determining whether section 1983 applies. WIANG has relied on the governing federal statutory scheme, *see* 10 U.S.C. § 101(42), to label Knutson a federal employee. Knutson, on the other hand, points to a Wisconsin statute that distinguishes federal armed service employees from members of state National Guards.

*See* Wis.Stat. § 21.025 (1992). Knutson's employment status, however, is not pertinent in evaluating the availability of section 1983. The relevant inquiry is whether WIANG, and Adjutant General Slack in particular, were acting under color of state or federal law when they terminated Knutson's Guard tour.

WIANG contends that numerous federal statutes and regulations affect its operation. For example, the federal government provides salaries, benefits, and supplies to full-time Guard officers and technicians. *See, e.g.,* 32 U.S.C. § 107 (West.Supp.1992). If a state National Guard elects, for some reason, not to comply with federal regulations, that state risks forfeiture of federal monies and other privileges. *See* 32 U.S.C. § 108. More specifically, Adjutant General Slack was acting pursuant to regulations adopted by the Department of Defense. *See* ANGR 35–03. Knutson, on the other hand, argues that the totality of the circumstances makes clear that the state law character of Slack's actions predominates. First, Wisconsin has adopted all applicable federal rules and regulations for its National Guard. *See* Wis.Stat. §§ 21.-01, 21.36. Furthermore, under state law, the governor acts as the commander-in-chief of WIANG. *Id.* at § 21.09. His authority includes appointing an Adjutant General, the person answering for Knutson's termination.

■ No set formula exists for determining whether the representatives of an agency with both state and federal characteristics act under color of state law. Our evaluation of whether particular conduct constitutes action taken under color of state law focuses on the nature of that action and functional capacity of the actor. *See, e.g., Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 399–400, 99 S.Ct. 1171, 1176, 59 L.Ed.2d 401 (1979). We do not ask whether the conduct was pursuant to a state statute but "whether there is a sufficiently close nexus between the State and the challenged action," *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974); *cf. United States v. Orleans,* 425 U.S. 807, 815, 96 S.Ct. 1971, 1976, 48 L.Ed.2d 390 (1976) (inquiry is whether "day-to-day operations are supervised by the Federal Government").

The facts here present the rather straightforward case of state officers exercising their state authority to effectuate the termination of state militia personnel. Although WIANG argues that federal law governed its conduct by virtue of the overarching scheme of federal authorization for the Guard, the fact that Wisconsin adopts and WIANG opts to utilize federal substantive and procedural rules in the exercise of its authority does not alter the state-law character of its actions. *See, e.g., Schultz v. Wellman,* 717 F.2d 301, 305 (6th Cir.1983); *Lasher v. Shafer,* 460 F.2d 343, 346 (3d Cir.1972). No one is claiming that the Guard had been called into service by the federal government at the time of the termination. Moreover, WIANG is a part of the Wisconsin militia, with the governor serving as commander-in-chief. The Adjutant General, an appointee of the governor, effected the termination of Knutson. Slack's actions, administered at the state level, are therefore under color of state law.

## II.

 Whether Knutson, as a member of the National Guard, may invoke section 1983 for his termination by his superiors at WIANG also presents a question of the proper scope of judicial inquiry. In the present case, the district court employed the analysis elaborated by the Fifth Circuit in *Mindes v. Seaman,* 453 F.2d 197 (5th Cir.1971), in finding Knutson's claim for injunctive relief to be justiciable. We disagree with this conclusion and with the adoption of the four-factor analysis in *Mindes.*[2] As the Third Circuit has pointed out, the *Mindes* approach erroneously "intertwines the concept of justiciability with the standards to be applied to the merits of the case." *Dillard v. Brown,* 652 F.2d

316, 323 (3d Cir.1981); *accord Kreis v. Secretary of the Air Force,* 866 F.2d 1508, 1510 (D.C.Cir.1989). Rather than embracing the *Mindes* balancing test, we prefer a different approach. Our inquiry does not involve a balancing of individual and military interests on each side, but rather a determination of whether the military seeks to achieve legitimate ends by means designed to accommodate the individual right at stake to an appropriate degree.

### A.

Although the treatment of justiciability by the parties in their briefs is sparse, WIANG argued below that staffing and the nondiscriminatory administration of its regulations governing the retention of personnel are of sufficient importance to preclude our review at this stage. Traditionally, support for the view that claims concerning the composition of the military do not lie within the purview of the judiciary have been found in *Orloff v. Willoughby,* 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953) and *Gilligan v. Morgan,* 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973). In an oft-quoted passage from *Orloff,* the Supreme Court noted:

> [J]udges are not given the task of running the Army. The responsibility for setting up channels through which [complaints of discrimination, favoritism, etc.] can be considered and fairly settled rests upon the Congress and upon the President of the United States and his subordinates. The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army

---

**2.** The four factors identified in *Mindes* are:

1. The nature and strength of the plaintiff's challenge to the military determination. Constitutional claims, normally more important than those having only a statutory or regulatory base, are themselves unequal in the whole scale of values—compare haircut regulation questions to those arising in court-martial situations which raise issues of personal liberty. An obviously tenuous claim of any sort must be weighted in favor of declining review.
2. The potential injury to the plaintiff if review is refused.

**3.** The type and degree of anticipated interference with the military function. Interference per se is insufficient since there will always be some interference when review is granted, but if the interference would be such as to seriously impede the military in the performance of vital duties, it militates strongly against relief.
**4.** The extent to which the exercise of military expertise of discretion is involved. Courts should defer to the superior knowledge and experience of professionals in matters such as promotions or orders directly related to specific military functions.

*Id.* at 201–02.

matters as the Army must be scrupulous not to intervene in judicial matters.

*Orloff,* 345 U.S. at 93–94, 73 S.Ct. at 540. But reading *Orloff* to support broad deference to the military ignores the narrow context in which this language is meant to apply. Deference to the military only affected the Supreme Court's judgment as to the merits of Orloff's constitutional claim, not the question of whether it should have reviewed the claim at all. *Id.,* 345 U.S. at 91, 73 S.Ct. at 539. *Gilligan,* which arose out of the tragic events at Kent State, contains similarly sweeping language. According to the *Gilligan* Court, the Constitution vests "[t]he complex, subtle and professional decisions as to the composition, training, equipping, and control of a military force" exclusively in the legislative and executive branches. *Gilligan,* 413 U.S. at 10, 93 S.Ct. at 2446. However, the decision not to review in *Gilligan* was made because of the relief sought (continuing oversight of National Guard training) rather than because of the underlying claims. The case did not immunize the military from all judicial scrutiny. *Id.* at 10–11, 93 S.Ct. at 2446 ("It should be clear that we neither hold nor imply that the conduct of the National Guard is always beyond judicial review or that there may not be accountability in a judicial forum for violations of law or for specific unlawful conduct by military personnel.").

Therefore, it is not immediately apparent that Knutson's claims, including reinstatement, come within the parameters of these cases. WIANG directs our attention to the *Feres* doctrine to support immunity for the military. *See Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950). However, WIANG is misapprehending the scope of this case. *Feres* addressed the narrow question of the availability of the Federal Tort Claims Act against the United States for injuries suffered by military personnel while serving. WIANG then goes on to assert—mistakenly—that the Supreme Court in *Chappell v. Wallace* concluded that a member of the military cannot sue a superior under 42 U.S.C. § 1983. Relying on the

principle of deference to the military endorsed in *Feres,* the *Chappell* Court in fact concluded that military personnel cannot maintain an action for monetary damages against superior officers for alleged constitutional violations under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). *See Chappell v. Wallace,* 462 U.S. 296, 305, 103 S.Ct. 2362, 2368, 76 L.Ed.2d 586 (1983). In reaching this outcome, the *Chappell* Court appeared to rely on a couple of "special factors" to deny a *Bivens* remedy for the alleged constitutional violations. In particular, the Court identified "the unique disciplinary structure of the Military Establishment and Congress' activity in the field." *Id.* at 304, 103 S.Ct. at 2368.

While *Chappell* is not directly controlling, it nevertheless reflects the principle that a civilian court should exercise restraint in its review of an intraservice military dispute. As a consequence, the range of permissible lawsuits against military superiors is narrowly circumscribed. Of those circuits that have confronted this issue, five have disallowed section 1983 claims for monetary and injunctive relief by National Guard personnel. *Watson v. Arkansas National Guard,* 886 F.2d 1004 (8th Cir.1989); *Sebra v. Neville,* 801 F.2d 1135 (9th Cir.1986); *Crawford v. Texas Army National Guard,* 794 F.2d 1034 (5th Cir.1986); *Penagaricano v. Llenza,* 747 F.2d 55 (1st Cir.1984); *Martelon v. Temple,* 747 F.2d 1348 (10th Cir.1984), *cert. denied,* 471 U.S. 1135, 105 S.Ct. 2675, 86 L.Ed.2d 694 (1985).[3] Three of these circuits relied expressly on *Chappell* in concluding that these section 1983 claims are nonjusticiable. Both the First Circuit and the Ninth Circuit referred to *Chappell* but relied on the *Mindes* test to preclude justiciability of section 1983 claims. *Penagaricano,* 747 F.2d at 61–64; *Sebra,* 801 F.2d at 1141–42. As a rule, these courts have observed that the disruptive effect of damages suits on military discipline is the same regardless of whether the suit is a

3. We have previously rejected a section 1983 suit brought by a member of the National Guard; the suit was challenged and decided on Eleventh Amendment grounds. *Meadows v. State of Indiana,* 854 F.2d 1068 (7th Cir.1988).

*Bivens* claim or a section 1983 claim.[4]

In relying solely on *Chappell* to preclude monetary damages in section 1983 suits, these circuits have obscured the distinction between federal and state actors, in this case military officers. The two types of claims are not entirely parallel inasmuch as the *Bivens* claim is a judicially created remedy whereas section 1983 was enacted by Congress. After the Supreme Court's holding in *Chappell* that federal military officials have immunity from damages, we inquire here whether state officials should receive equal immunity. The difficulty in applying *Chappell* to these section 1983 claims lies in the fact that there was no common law immunity for military officers at the time of the enactment of the Civil Rights Act of 1871. *See Wilkes v. Dinsman*, 48 U.S. (7 How.) 89, 12 L.Ed. 618 (1849), *after remand Dinsman v. Wilkes*, 53 U.S. (12 How.) 390, 13 L.Ed. 1036 (1851) (naval commander who flogged and imprisoned enlisted seaman could be held liable for damages at common law). Nevertheless, the Supreme Court in *Butz v. Economou* left little doubt that as far as the immunity of government officials is concerned, *Bivens* and section 1983 claims merit similar treatment. 438 U.S. 478, 500–01, 98 S.Ct. 2894, 2907–08, 57 L.Ed.2d 895 (1978); *accord Harlow v. Fitzgerald*, 457 U.S. 800, 819 n. 30, 102 S.Ct. 2727, 2738 n. 30, 73 L.Ed.2d 396 (1982).

█ *Butz*, which posed the obverse of the situation before us, addressed whether federal officials should receive greater immunity from *Bivens* claims than the qualified immunity that state officials receive under section 1983. The Supreme Court in *Chappell* carved out an exception for federal military officers to *Bivens* actions based on policy considerations, considerations which may be less relevant to section 1983 claims against state military officers. *Butz*, however, does not contemplate distinguishing immunity for federal officials from state officials, which would include members of the state militia such as the Adjutant General. Indeed, both the Supreme Court and Congress have recognized the integral role the Guard plays in the national armed forces. *See Gilligan*, 413 U.S. at 7, 93 S.Ct. at 2444 ("The Guard is an essential reserve component of the Armed Forces of the United States."); 32 U.S.C. § 102. Consequently, *Butz* and *Chappell* compel the conclusion that National Guard officers are not liable for damages in section 1983 actions.

### B.

As far as injunctive relief is concerned, the Supreme Court has not come up with a per se rule exempting military decisions from judicial review. It has, in fact, reviewed a broad range of claims against the military. *See, e.g., Goldman v. Weinberger*, 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986) (first amendment challenge to Air Force dress code regulation); *Rostker v. Goldberg*, 453 U.S. 57, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981) (equal protection challenge to all-male draft registration); *Brown v. Glines*, 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980) (first amendment challenge to Air Force regulation regarding circulation of petitions); *Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974) (vagueness challenge to criminal provisions of military code); *Frontiero v. Richardson*, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) (equal protection challenge to statutes discriminating against women in military bene-

---

4. At least one circuit, relying on *Mindes*, has concluded that failure to exhaust intraservice remedies precludes federal review. *See, e.g., Williams v. Wilson*, 762 F.2d 357, 359 (4th Cir. 1985). The record here is silent as to whether Knutson pursued an administrative remedy, and even whether one exists. It does appear that he could have sought relief from the Air Force Board for Correction of Military Records. *See* 10 U.S.C. § 1552. Had he done so, our review would have been remarkably similar to our normal review of an agency action, in which we require only that the agency exercise its discretion in a reasonable manner while deferring to the agency's ultimate substantive decision. In fact, *Chappell* specifically holds out the possibility of this type of judicial review. *Chappell*, 462 U.S. at 303, 103 S.Ct. at 2367. However, whether he did so may not matter. *Patsy v. Board of Regents*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), held that exhaustion is not mandatory in section 1983 cases. Because we conclude that Knutson's section 1983 claim is not justiciable, we need not resolve the exhaustion question here.

fits). *Chappell* itself did not specifically preclude injunctive relief against the military. Moreover, we have entertained such suits for injunctive relief. *See, e.g., Ogden v. United States,* 758 F.2d 1168, 1174 (7th Cir.1985) (Supreme Court has never held "that military personnel are barred from all redress in civilian courts for constitutional wrongs suffered in the course of military service") (citing *Chappell,* 462 U.S. at 305, 103 S.Ct. at 2367).

What remains unclear is the scope of injunctive relief available in civilian courts. Two circuits have held that a member of the National Guard may be entitled to reinstatement under section 1983. *See Jorden v. National Guard Bureau,* 799 F.2d 99 (3d Cir.1986); *Schultz v. Wellman,* 717 F.2d 301 (6th Cir.1983).[5] In the latter case, appellant Schultz was a civil technician and a sergeant in the Kentucky Air National Guard who pled guilty to a misdemeanor under North Carolina state law. He brought a section 1983 action seeking reinstatement, back pay, and declaratory and injunctive relief. In dismissing the claim for failure to state a claim, the Sixth Circuit explicitly declined to address the justiciability of such claims. *Schultz,* 717 F.2d at 303 n. 6.

The Third Circuit, on the other hand, extensively examined the availability of injunctive relief against the military. Jorden, who held both civilian and military positions in the Pennsylvania Air National Guard, became either a "whistleblower" or a "troublemaker." An Order of the Governor called Jorden individually to active duty for "special training"; the order specified that Jorden was to report to the Malcolm Grow Center for psychiatric evaluation. Jorden refused to comply and was dismissed from both his civilian and military positions. Subsequently, Jorden brought suit alleging conspiracy to harass, racially motivated discharge, and retaliation for the exercise of his First Amendment rights. He requested damages and reinstatement under sections 1983, 1985, and 1986. The Third Circuit dismissed the damages claim but remanded the claim for injunctive relief. Relying in part on the qualification for injunctive relief in *Gilligan,* it rationalized that *Chappell* did not preclude claims for injunctive relief and that the specific claim before it did not impact military decisionmaking significantly. According to the Third Circuit, reinstatement may pose a less serious threat to vigorous decisionmaking than monetary relief. *Jorden,* 799 F.2d at 110. *Accord Dillard,* 652 F.2d at 319–24 (unmarried female Guard enlistee with minor child challenged constitutionality of regulation disqualifying single enlistees with minor dependents after discharge under that regulation).

Jorden's suit, although brought under section 1983, raised constitutional issues more akin to those addressed by the Supreme Court in cases such as *Goldman, Rostker, Parker,* and *Frontiero* as well as by us in *Ogden.* In Jorden's case, the predominant issue was the exercise of his First Amendment rights. Knutson's challenge to his termination, on the other hand, implicates only the nature of the procedure used in his termination. The interference that judicial review poses here is more than a matter of administrative inconvenience. These sorts of reinstatement claims, often pending for several years in civilian courts, may well leave WIANG in limbo awaiting the outcome of litigation and thus significantly hamper its ability to staff properly and to fulfill its mission. If civilian courts are regularly open to claims challenging personnel decisions of the military services, judicial review may also undermine military discipline and decisionmaking or impair training programs and operational readiness. For these reasons, civilian courts have traditionally deferred to the superior experience of the military in matters of duty orders, promotions, demotions, and retentions. Knutson's request for reinstatement would require us to intrude on a province committed to the military's discretion, which we decline to do.

For the foregoing reasons, Knutson's appeal is DISMISSED as nonjusticiable.

---

**5.** Knutson cites *Johnson v. Orr,* 780 F.2d 386 (3d Cir.1986) to support the justiciability of this claim. This case is inapposite inasmuch as the Third Circuit explicitly avoided the question of justiciability. *Id.* at 389 n. 6.