John L. BRADLEY, III, Plaintiff,

v.

E. Gordon STUMP, Ronald Seeley and Department of Military Affairs of the State of Michigan, jointly and severally, Defendants.

No. 1:96–CV–674.

United States District Court,
W.D. Michigan,
Southern Division.

March 28, 1997.

Richard P. Diehl, Diehl & Sobczak, PC, Troy, MI, for plaintiff.

Michael C. McDaniel, Asst. Attorney General, Tort Defense Division, Lansing, MI, for defendants.

## OPINION OF THE COURT

McKEAGUE, District Judge.

In his complaint, plaintiff essentially asks this Court to recognize either a federal or state, constitutionally- or statutorily-created, right of a military base commander to supervise his or her spouse while serving in the armed services of the United States. Plaintiff has failed to cite a single statute, regulation or case which supports such a right. Neither has this Court found any case that supports plaintiff's alleged right to command a military base where his spouse is employed or in the alternative to be protected from a military superior's anti-nepotism policy which punishes an officer who fails to avoid such a conflict of interest. Plaintiff has also failed to convince this Court that a new right of this type should be created. Against plaintiff's complete failure to state a claim upon

which relief can be granted, defendants have identified numerous jurisdictional bars to this Court even considering plaintiff's complaint. For these reasons, as outlined in the opinion that follows, the Court grants defendants' motion to dismiss plaintiff's complaint for failure to state a claim upon which relief can be granted.

## I. Factual Background

The facts are those set forth in plaintiff's complaint.[1] Plaintiff, John L. Bradley III, a resident of Huntington, West Virginia, formerly resided in Battle Creek, Michigan where he served as commander of Battle Creek National Guard Base, ("BCANGB"), until he retired in March 1995. Bradley held dual status as a commissioned colonel in the Michigan Air National Guard and the Air National Guard of the United States. As base commander during the week, plaintiff was considered a grade GM15 federal technician pursuant to 32 U.S.C. § 709. When engaging in active state duty on weekends, during annual training or on special call up duty, plaintiff served both as base commander and as commander of the 110th Fighter Group, a unit of the Michigan Air National Guard.

Defendant, E. Gordon Stump, was appointed by the governor of Michigan to serve as adjutant general of the National Guard for the State of Michigan and is the director of the Michigan Department of Military Affairs. Defendant, Ronald L. Seely, was appointed by the adjutant general to serve as assistant adjutant general for the Air National Guard of Michigan and is deputy director of the Michigan Department of Military Affairs. Both Stump and Seely are employees of the State of Michigan and not the federal government.

Plaintiff married Linda L. Bradley on April 10, 1992. Mrs. Bradley was employed as a competitive service federal employee at BCANGB. Although in his complaint, plaintiff asserted that Mrs. Bradley "was not a subordinate of Bradley's as she worked in Base Operations away from her husband"

---

1. In addition, the facts have been supplemented by input from plaintiff's counsel during the hearing on this motion on October 30, 1996. In a couple of cases where plaintiff's counsel during

oral argument corrected or modified factual assertions in the complaint, the Court has relied on counsel's input in lieu of any contradictory representation in the complaint.

and that plaintiff "was not in her performance rating chain," plaintiff's counsel conceded at oral argument that all employees at BCANGB, including plaintiff's wife, were ultimately supervised and under the direct chain of command of plaintiff.

Under Air National Guard Regulations ("ANGR"), plaintiff, along with all Air National Guard officers with over 20 years of qualifying military service, must be reviewed annually for consideration of retention, or separation from, their state National Guard, by the Annual Retention Board.[2] The Annual Retention Board ("ARB") is a board of officers from within the state's military establishment, each of whom is more senior in rank than the person being evaluated. The ARB considers the limited information submitted to it about the officer under consideration and recommends to the adjutant general whether the officer should be retained or discharged from the reserve component of the U.S. Air Force. A part of the information considered by the ARB is a current appraisal written by the rating "chain of command" within two to three months before the ARB convenes. This report assesses the rated officer's current performance, potential and recommends retention or non-retention in the Air National Guard of the United States. If the ARB recommends non-retention, the officer affected can appeal the decision to the adjutant general. If the adjutant general denies the appeal, the officer is separated from the Air National Guard of the United States within months. Once separated from the Air National Guard, the officer normally also is separated from the state National Guard. If an officer is separated from the state National Guard, the officer can no longer maintain his weekday employment as a federal technician because 32 U.S.C. § 709(b) requires that technicians "be a member of the National Guard and hold the military grade specified by the Secretary [of the Air Force] concerned for that position." So to retain his employment as a GM15 federal technician, plaintiff was required to maintain his rank as a colonel in the Air National Guard.

According to the complaint, on January 6, 1994, defendant Seely summoned plaintiff to Michigan National Guard headquarters in Lansing for a mid-year performance review. Once there, plaintiff was informed that either he or his wife would "have to go" because defendant Stump would "not allow a Base Commander and his wife to work on the same installation."[3] Defendant Stump then allegedly came in the room and both he and defendant Seely insisted that either plaintiff or his wife would "lose his or her job." Seely and plaintiff discussed the matter again on February 23, 1994 at a commanders meeting.

---

**2.** Plaintiff attributes this policy to ANGR 35–06, but has failed to provide a copy of that regulation to the Court. Despite diligent efforts, the Court has been unable to obtain a copy of this regulation on its own. However, it appears to be the same regulation, cited as ANGR 36–06, and described by the Ninth Circuit as "developed by the National Guard Bureau, an organization which serves as the channel of communication between the Department of Defense and the various state National Guards, 10 U.S.C. § 3040, and was issued by order of the Secretary of the Air Force." *Christoffersen v. Washington State Air National Guard*, 855 F.2d 1437, 1438–39 (9th Cir.1988), *cert. denied*, 490 U.S. 1098, 109 S.Ct. 2448, 104 L.Ed.2d 1003 (1989). The Ninth Circuit described the program, called for by ANGR 36–06, as follows:

Under the Vitalization Program, an Advisory Board appointed by the state Adjutant General annually reviews every eligible officer to 'evaluat[e] the future benefits that can be expected to accrue to the Air National Guard from [his] continued service.' ANGR 36–06, ¶ 10d; . . . The regulation lists a number of criteria, related both to the qualifications of the individual and the needs of the Air National Guard, to be considered by the Advisory Board in recommending retention or separation of each officer. *Id.* ¶ 10e. One factor is the officer's status with regard to technician retirement eligibility. *Id.* ¶ 10e(4). The state Adjutant General is not bound by recommendations of the Advisory Board and may approve or disapprove any specific recommendation. *Id.* § 11b(1).

**3.** According to the complaint, at around this same time, Stump and Seely apparently made the same demand of Alan Ness, the commander of the 127th Fighter Wing at the Selfridge Air National Guard Base, whose wife was an enlisted person on full-time military duty in the Active Guard Reserve program at the Selfridge base. However, Mrs. Ness apparently transferred to duty with the Ohio National Guard in Toledo, Ohio. The fact that defendants applied this unwritten anti-nepotism policy to all similarly situated base commanders flies in the face of plaintiff's suggestion that he was somehow unfairly signaled out by defendants.

Seely told plaintiff at a private luncheon "he would deny in Court that he ever insisted that either Bradley or his wife must leave his or her job." Plaintiff informed Seely that as base commander he lacked the authority to force a federal competitive service employee, such as his wife, to resign or transfer.

The complaint further indicates that after plaintiff was notified of defendants' opposition to base commanders supervising their spouses, plaintiff's wife attempted to find off-base employment during a 14–month period between January 1994 and March 1995. Seely even interceded himself, inquiring of an acquaintance at the Kellogg Company, with its world headquarters in Battle Creek, whether outside employment could be obtained for plaintiff's wife. Attempts by plaintiff's wife to obtain other employment were apparently unsuccessful. Plaintiff's complaint does not indicate whether he sought a transfer within the National Guard establishment. However, plaintiff's counsel indicated at oral argument that plaintiff sought and was denied a transfer, although counsel conceded he was unaware whether the equivalent of any base commander positions became vacant during the time when plaintiff was seeking such a transfer. The record is also silent on whether plaintiff, like his spouse, also attempted to find non-military employment during this 14–month period.

From April 1, 1990 to March 31, 1994, all "Field Grade Officer Performance Reports" by Seely evaluated plaintiff's performance in "nothing less than superlatives," according to the complaint.[4] On March 13, 1995, Seely met with plaintiff at his BCANGB office and presented him with a proposed "Federal Retention Evaluation/Recommendation" form for 1995 that rated him 'extremely low on potential and recommended non-retention' in the Air National Guard of the United States pursuant to Air National Guard Regulations. Seely told plaintiff the poor 1995 evaluation would be submitted to a "Selective Retention Board" scheduled to meet on May 7, 1995 unless plaintiff retired immediately. Seely allegedly also told plaintiff that Seely had selected the members of this board, the board would recommend non-retention and that while plaintiff could appeal the decision to Stump, any such effort would be in vain because "Stump had already decided that Bradley could no longer remain" and "would be out of the Air National Guard of the United States by the end of 1995 or earlier."

Seely allegedly planned the timing of this March 13, 1995 meeting with plaintiff because the federal government was offering a $25,000 incentive bonus for federal employees to retire before March 31, 1995.[5] Plaintiff's complaint reports Seely gave him nine days, or until March 16, 1995,[6] to submit his application for retirement from the Air National Guard of the United States.

Confronted with this situation, plaintiff claims he had only two alternatives: resist defendants' efforts "to force him out of the Michigan Air National Guard" or "retire prematurely." Plaintiff complains that any effort to resist Seely's efforts would have been futile because the only avenue for appeal was Stump, the alleged mastermind of this plan. If he resisted defendants' efforts, the 50–year-old plaintiff says he risked losing 12

---

**4.** The complaint references some of these reports as exhibits. However, these exhibits were not supplied to the Court by the parties. Although the Court assumes these exhibits were included with plaintiff's original state court complaint, they were not attached to the copy of the complaint that the defendants included, as required under 28 U.S.C. § 1446 with the Notice of Removal. It does not appear that this oversight by defendants was noticed when plaintiff received a copy of the removal notice, nor does it appear to have prejudiced plaintiff. The Court will assume that all exhibits contain the information described in plaintiff's complaint.

**5.** Contrary to plaintiff's assertion, the fact that plaintiff was approached by defendants prior to the early retirement deadline appears to weaken plaintiff's claim that defendants were out to get plaintiff and intentionally discriminated against him without concern for his personal situation.

**6.** The complaint contradicts itself. Plaintiff first says in ¶43 there was a meeting on March 13, 1995, and then says in ¶48 that plaintiff was given until March 16, 1995 or "nine days" to accept the early retirement offer. It is not clear whether plaintiff had three days or nine days to make this decision. However, considering that plaintiff had known for roughly 14 months that his superiors disapproved of his commanding a base where his wife worked, this distinction has no bearing on the outcome of this case.

years of retirement pay and being forced to give up his federal technicians job. Plaintiff "had no viable alternative but to retire immediately rather than be forced out of the Michigan Air National Guard/Air National Guard of the United States" which would prevent him from qualifying for the federal early retirement incentive bonus and immediate monthly retirement benefits, according to the complaint. By retiring at age 50, plaintiff complains that his pension benefits will always be 10 percent less than if he had waited until age 55 to retire. In his complaint, plaintiff does not attempt to quantify the total economic loss he allegedly suffered by his decision to take early retirement.

Plaintiff complains that he had no administrative remedies available to him beyond an appeal to Stump and that there were no federal administrative remedies available. Plaintiff complains that the acts of Seely and Stump, both state employees, purportedly under a federal regulation, (ANGR 35–06), were "arbitrary and capricious abuses of power nowhere authorized by state law" and as such were "ultra vires" and therefore subject both individual defendants to personal liability.

Plaintiff's complaint consists of four counts. In Count I, plaintiff charges that Stump and Seely violated the Michigan Elliott–Larsen Civil Rights Act, M.C.L. § 37.2701 *et seq.* by illegally discriminating against him on the basis of his marital status. In Count II, plaintiff charges that Stump and Seely violated his due process and equal protection rights under the Michigan Constitution. In Count III, plaintiff charges that a third defendant, the state Department of Military Affairs, violated Michigan's Administrative Procedures Act, M.C.L. § 24.201 *et seq.* In count IV, plaintiff charges that defendants Stump and Seely violated his First Amendment rights to freedom of association, his Fifth Amendment due process rights to marry, and 14th Amendment procedural due process and equal protection rights in violation of 42 U.S.C. § 1983, and conspired to violate those rights under 42 U.S.C. § 1985(3).

In his multiple prayers for relief, plaintiff requests this Court award him economic damages for lost wages, lost access to free educational training, and reduced pension benefits. Plaintiff also requests (1) an injunctive order enjoining defendants and their successors from discriminating against National Guard members on the basis of their marital status, (2) a declaratory judgment holding that the Michigan adjutant general has no legal authority under state law to control members of the United States Air Force and enter a writ of mandamus enjoining the adjutant general from exercising any authority not specifically granted by state law, (3) this Court declare that Stump and Seely acted outside the scope of their authority and are thus individually liable for damages, (4) this Court hold that any rule or regulation of the Department of Military Affairs not published in compliance with Michigan's APA be deemed legally null and void, and (5) plaintiff be awarded special damages, attorney fees and "such other relief as deemed just and equitable."

Plaintiff filed the present complaint in Ingham County Circuit Court and it was served on defendants on July 31, 1996. On August 18, 1996, defendants removed the case to this Court asserting federal question jurisdiction due to plaintiff's federal Constitutional claims pursuant to 28 U.S.C. § 1331. Defendants also asserted jurisdiction under 28 U.S.C. § 1442a, providing federal jurisdiction for any claim in which a member of the armed forces is sued regarding their authority "under a law of the United States respecting the armed forces." Although plaintiff initially questioned whether this Court had jurisdiction, he failed to file a motion to remand the case back to state court and conceded at oral argument that this Court has jurisdiction over all four counts in plaintiff's complaint. Now before the Court is defendants' motion to dismiss plaintiff's claim. The Court held a hearing on the motion on October 30, 1996, has carefully read the parties pleadings and briefs and now considers the legal issues presented by defendants' motion.

## II. Fed.R.Civ.P. 12(b)(6) Standard

Defendants move to dismiss plaintiff's complaint for failure to state a claim upon which relief can be granted pursuant to Fed. R.Civ. P. 12(b)(6). In this regard, the Court must accept the allegations contained in the

plaintiff's complaint as true. *Wright v. MetroHealth Medical Center,* 58 F.3d 1130, 1138 (6th Cir.1995), *cert. denied,* — U.S. —, 116 S.Ct. 1041, 134 L.Ed.2d 188 (1996). "A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (quoting *Cameron v. Seitz,* 38 F.3d 264, 270 (6th Cir.1994); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)). "In considering a motion under Fed.R.Civ.P. 12(b)(6), it is not the function of the court to weigh the evidence or evaluate the credibility of witnesses, instead, the court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief." *Id.* A court may not grant dismissal under Fed. R.Civ. P. 12(b)(6) merely because it does not believe the factual allegations of the complaint. *Id.*

### III. Justiciability

■ The first hurdle plaintiff must overcome is convincing this Court that the subject matter of this complaint, an intra-military personnel dispute, is even within the purview of this civilian court. Military authorities have been charged by the Executive and Legislative Branches with carrying out our nation's military policy. *Goldman v. Weinberger,* 475 U.S. 503, 508, 106 S.Ct. 1310, 1313–14, 89 L.Ed.2d 478 (1986). The United States Supreme Court has long held that civilian courts should hesitate to interfere in military matters. *Chappell v. Wallace,* 462 U.S. 296, 300, 103 S.Ct. 2362, 2365–66, 76 L.Ed.2d 586 (1983). For example, "[c]ourts regularly decline to hear lawsuits involving personnel actions integrally related to the military's unique structure." *Mier v. Owens,* 57 F.3d 747, 749 (9th Cir.1995)(quoting *Chappell* ), *cert. denied,* — U.S. —, 116 S.Ct. 1317, 134 L.Ed.2d 470 (1996). *Chappell* "reflects the principle that a civilian court should exercise restraint in its review of an intraservice military dispute. As a consequence the range of permissible law-

suits against military supervisors is narrowly circumscribed." *Knutson v. Wisconsin Air National Guard,* 995 F.2d 765, 769 (7th Cir. 1993) (citing *Chappell* ), *cert. denied,* 510 U.S. 933, 114 S.Ct. 347, 126 L.Ed.2d 311 (1993).

In *Chappell,* the Supreme Court held that military personnel cannot sue superior officers to recover damages for alleged constitutional violations because the "relationship between enlisted military personnel and their superior officers ... is at the heart of the necessarily unique structure of the Military Establishment." *Id.* at 300, 103 S.Ct. at 2366. "The most obvious reason is that courts are ill-equipped to determine the impact upon discipline that any particular intrusion upon military authority might have." *Id.* at 305, 103 S.Ct. at 2368. Although *Chappell* concluded that "military personnel may not maintain a suit to recover damages from a superior officer for alleged constitutional violations" under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the court did not specifically address damage claims under § 1983. *Knutson,* 995 F.2d at 769.

Of the federal Courts of Appeals that considered whether *Chappell* should be extended to § 1983 claims, "five have disallowed section 1983 claims for monetary and injunctive relief by National Guard personnel." *Id.* (adding the Seventh Circuit as the sixth to so hold and extending the principle to § 1983, actions against state military officers). In a decision handed down only three months after *Chappell,* the Sixth Circuit explicitly sidestepped the issue of "whether such a claim is justiciable in the first instance." *See Schultz v. Wellman,* 717 F.2d 301, 303 n. 6 (6th Cir.1983) (holding that although National Guard officials could be deemed to have acted under color of state law for § 1983 purposes, plaintiff failed to state a claim upon which relief may be granted). So although the Sixth Circuit has yet to address this narrow question, the majority of other circuits have adopted reasoning that would bar § 1983 actions against state military officials for monetary or injunctive relief.[7]

---

7. *See Watson v. Arkansas National Guard,* 886 F.2d 1004 (8th Cir.1989); *Sebra v. Neville,* 801

■ Applying the non-justiciability doctrine to the case at bar, this Court finds there is ample proof that a lawsuit of this type, challenging the authority of a senior military official to discipline an inferior officer for violating an unwritten anti-nepotism policy, is exactly the kind which warrants restraint of this Court's authority. In an oft-quoted passage from *Orloff v. Willoughby,* 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953), the Supreme Court noted:

> [J]udges are not given the task of running the Army. The responsibility for setting up channels through which [complaints of discrimination, favoritism, etc.] can be considered and fairly settled rests upon the Congress and upon the President of the United States and his subordinates. The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters.

*Orloff,* 345 U.S. at 93–94, 73 S.Ct. at 540. As the Supreme Court noted in *Chappell:* "The inescapable demands of military discipline and obedience to orders cannot be taught on battlefields; the habit of immediate compliance with military procedures and orders must be virtually reflex with no time for debate or reflection." *Id.* at 300, 103 S.Ct. at 2365–66. "A Guard technician's challenge to a military transfer is nonjusticiable in part because transfer decisions go to the core of deployment of troops and overall strategies of preparedness." *Sebra v. Neville,* 801 F.2d 1135, 1142 (9th Cir.1986). "Guard technicians' challenges to discharge by the Guard and termination from technician employment are nonjusticiable because judicial review would seriously impede the military in performance of its vital duties." *Christoffersen v. Washington State Air National Guard,*

855 F.2d 1437, 1444 (9th Cir.1988), *cert. denied,* 490 U.S. 1098, 109 S.Ct. 2448, 104 L.Ed.2d 1003 (1989).

Here, this Court finds that allowing plaintiff to bring suit and challenge the authority of the leaders of the Michigan National Guard and their decision on the retention or non-retention of a base commander for violating their direct orders implicates the justiciability concerns raised in the above-cited cases. As the Seventh Circuit noted in *Knutson:*

> The interference that judicial review poses here is more than a matter of administrative inconvenience. These sorts of reinstatement claims, often pending for several years in civilian courts, may well leave [the Wisconsin Air National Guard] in limbo awaiting the outcome of litigation and thus significantly hamper its ability to staff properly and to fulfill its mission. If civilian courts are regularly open to claims challenging personnel decisions of the military services, judicial review may also undermine military discipline and decision making or impair training programs and operational readiness. For these reasons, civilian courts have traditionally deferred to the superior experience of the military in matters of duty orders, promotions, demotions, and retentions. [Plaintiff's] request for reinstatement would require us to intrude on a province committed to the military's discretion, which we decline to do.

*Knutson,* 995 F.2d at 771. "Judicial review could also impair the ability of the National Guard to make retention decisions based on subjective, though appropriate, criteria of military efficiency." *Christoffersen,* 855 F.2d at 1443.

Were this Court to allow plaintiff's claim to proceed, it does not take a great deal of imagination to foreshadow how much his

---

F.2d 1135 (9th Cir.1986); *Crawford v. Texas Army National Guard,* 794 F.2d 1034 (5th Cir. 1986); *Penagaricano v. Llenza,* 747 F.2d 55 (1st Cir.1984); *Martelon v. Temple,* 747 F.2d 1348 (10th Cir.1984), *cert. denied,* 471 U.S. 1135, 105 S.Ct. 2675, 86 L.Ed.2d 694 (1985). Three of these circuits relied expressly on *Chappell* in concluding that these § 1983 claims are nonjusticiable. Both the First Circuit and the Ninth

Circuit referred to *Chappell* but relied on the *Mindes* test to preclude justiciability of § 1983 claims. *Penagaricano,* 747 F.2d at 61–64; *Sebra,* 801 F.2d at 1141–42. As a rule, these courts have observed that the disruptive effect of damages suits on military discipline is the same regardless of whether the suit is a *Bivens* claim or a § 1983 claim.

claim could ultimately disrupt the state's military establishment. Once word spread through the ranks that personnel decisions made by the state adjutant general and assistant adjutant general could be second-guessed in federal court, those officials' authority would be at least partially undermined. Every time an order came down, rather than faithfully obeying their orders, troops might stop and ponder what kind of constitutional challenge they could mount to undo the order. It was to avoid exactly these kinds of concerns that Courts over the years established the doctrine of restraint with regard to challenges of military personnel decisions.

For these reasons, the Court finds that plaintiff's claims for monetary and injunctive relief against his former military superiors for alleged constitutional violations are non-justiciable and therefore plaintiff has failed to state a claim upon which relief can be granted under Fed.R.Civ.P. 12(b)(6). However, even if plaintiff's claims were justiciable, this Court holds in the alternative, for the reasons stated below, that plaintiff has failed to state a viable claim.

### IV. Marital Status Discrimination

In his four-count complaint, three of plaintiff's counts depend on his being able to show that defendants Stump and Seely illegally discriminated against plaintiff on the basis of his marital status. Plaintiff's complaint essentially argues that because defendants refused to allow plaintiff to command a military base where his wife was employed, plaintiff was discriminated against on account of his marital status. Plaintiff argues that defendants actions violated (1) Michigan's Elliott–Larsen Civil Rights Act ("ELCRA"), (2) plaintiff's First Amendment right to freedom of association in violation of § 1983,[8] (3) plaintiff's Fifth Amendment due process right to marry in violation of § 1983, (4) plaintiff's procedural due process rights under the 14th Amendment in violation of § 1983 and (5) plaintiff's state Constitutional rights. Plaintiff's counsel conceded at oral

argument that the standard for determining whether plaintiff was the victim of illegal marital status discriminate was essentially the same under his § 1983 claim as under ELCRA. Therefore, the Court will proceed with its ELCRA analysis, followed by a consideration of any other issues raised by the four remaining claims.

#### 1. Plaintiff's ELCRA Claim

Plaintiff alleges in his complaint that he was a federal employee of the Michigan Air National Guard and that he was wrongfully coerced into retirement by defendants because his wife was also a federal employee at the BCANGB. Plaintiff complains that it is unlawful for state officials to "target a specific person from the state military establishment" under an "unpublished anti-nepotism policy" while other married couples work together throughout the state military establishment.

The Elliott–Larsen Civil Rights Act prohibits discrimination in employment in the State of Michigan. Under the Act:

> An employer shall not ... fail or refuse to hire, or recruit, or discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment because of ... marital status.

M.C.L.A. § 37.2202(1). Defendants contend that the ELCRA cannot possibly apply to employment actions taken against federal employees disciplined by state military officials acting pursuant to federal law, arguing that neither plaintiff nor defendants would be covered by ELCRA, a state statute. Because the Court finds that plaintiff has failed to state a claim under ELCRA, the Court need not reach the complicated issue of whether ELCRA applies on these facts.

■ The Michigan Supreme Court has noted the "relevant inquiry in a marital status discrimination claim under the Act is whether discrimination occurred based on "if

---

8. Although plaintiff, in Count IV, also asserted a claim under 42 U.S.C. § 1985(3), alleging defendants engaged in a conspiracy to deprive him of his federal constitutional rights. This claim fails for the same reasons as the § 1983 claims:

plaintiff has failed to identify a constitutional right which. defendants violated, whether individually under § 1983 or while acting as part of a conspiracy under § 1985.

one is married rather than to whom one is married." *Miller v. C.A. Muer Corp.,* 420 Mich. 355, 362–63, 362 N.W.2d 650 (1984) (as quoted by this Court in *Coyle v. Health Care & Retirement Corp. of America,* 1994 U.S. Dist. LEXIS 10279 (1994)). The *Miller* court concluded that the term "marital-status" in the ELCRA did not include the identity, occupation, or place of employment of one's spouse. *Id.* at 362–63, 362 N.W.2d 650. The Court thus upheld anti-nepotism policies very much like those plaintiff has described as discriminatory in this case.

■ Plaintiff does not allege that defendants discriminated against him because he was married, but rather because he was married to an employee who worked at the base where he was commander. The *Miller* court made it clear that its interpretation of the term "marital status" under ELCRA "did not protect a right to be employed in the same department as one's spouse." *Coyle,* supra at 6 (quoting *Miller,* 420 Mich. at 362–364, 362 N.W.2d 650.) Other courts interpreting Michigan law on this point have reached the same conclusions. *See Whirlpool Corp. v. Civil Rights Comm'n,* 425 Mich. 527, 390 N.W.2d 625 (1986).(applying reasoning in *Miller* to uphold anti-nepotism policy); *Bryant v. Automatic Data Processing,* 151 Mich.App. 424, 390 N.W.2d 732 (1986)(interpreting *Miller* ).

Plaintiff contends that "There is no lawful anti-nepotism policy that precludes spouses from working in the same Department or on the same Base." At most he appears to claim that if there is an anti-nepotism policy, it was neither published nor consistently enforced. Plaintiff, in his response brief, lists four other married couples who he claims work together within the National Guard in violation of the same anti-nepotism policy that he claims defendants unlawfully enforced against he and his wife. There are two flaws with this contention. First, during oral argument plaintiff's counsel conceded that none of the four couples involved one spouse working under the direct supervision of the other spouse. They simply worked in offices near each other, sometimes under the same supervisor, but never in roles where one spouse was under the direct chain of command of

the other spouse. Second, there is no state or federal law this Court is aware of that requires an employer to adopt, let alone consistently enforce, an anti-nepotism policy. What is clear is that under the *Miller* decision, such policies have been held to not constitute discrimination on the basis of marital status. So to the degree courts have already considered and rejected plaintiff's argument that ELCRA prohibits anti-nepotism policies like the one at issue in this case, plaintiff's complaint fails to state a claim for which relief can be granted.

### 2. First and Fifth Amendment Claims under § 1983

For the same reason that plaintiff fails to make out a viable ELCRA claim, plaintiff also fails to make out a claim that his First Amendment right to freedom of association or his Fifth Amendment due process rights to be married were violated. Even if plaintiff had made out a legitimate claim of marital status discrimination under ELCRA, federal courts have thus far refused to acknowledge such a right even exists under the U.S. Constitution. Numerous federal courts, including the Sixth Circuit, have repeatedly held that there is no federal Constitutional right to be free of marital status discrimination.

■ To state a viable § 1983 claim, a plaintiff must allege that: (1) he was deprived of a right, privilege, or immunity-secured by the Federal Constitution or laws of the United States, and (2) the deprivation was caused by a person while acting under color of state law. *Flagg Bros. v. Brooks,* 436 U.S. 149, 155–57, 98 S.Ct. 1729, 1732–34, 56 L.Ed.2d 185 (1978); *Brock v. McWherter,* 94 F.3d 242, 244 (6th Cir.1996); *Ellison v. Garbarino,* 48 F.3d 192, 194 (6th Cir.1995); *Searcy v. City of Dayton,* 38 F.3d 282, 286 (6th Cir.1994). Although § 1983 is not itself a source of any substantive rights, *Albright v. Oliver,* 510 U.S. 266, 271, 114 S.Ct. 807, 811–12, 127 L.Ed.2d 114 (1994), the statute does provide a remedy for deprivations of rights that are elsewhere conferred. *Albright,* 510 U.S. at 271, 114 S.Ct. at 811–12; *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 924, 102 S.Ct. 2744, 2746–47, 73 L.Ed.2d 482

(1982); *accord Sutton v. Cleveland Bd. of Educ.,* 958 F.2d 1339, 1348 (6th Cir.1992).

■ The first hurdle plaintiff faces is establishing that defendants in acting to force the retirement of a federal employee while acting pursuant to a federal regulation were acting under "color of state law."[9] However, the Sixth Circuit held in a similar case involving the discharge of a member of the Kentucky Air National Guard that the action was taken "under the color of state law for purposes of § 1983." *Schultz v. Wellman,* 717 F.2d 301, 304 (6th Cir.1983).

■ Next, plaintiff must establish a federal Constitutional right to be free from marital status discrimination. While "it is well established that the right to marry is a fundamental right protected by the Due Process Clause of the Fourteenth Amendment[10] ..." not every state action which relates in anyway to the incidents of or prerequisites for marriage must be subjected to rigorous scrutiny. *Wright v. MetroHealth Medical Center,* 58 F.3d 1130, 1134–35 (6th Cir.1995)(citing *Planned Parenthood v. Casey,* 505 U.S. 833, 847, 112 S.Ct. 2791, 2805, 120 L.Ed.2d 674 (1992); *Zablocki v. Redhail,* 434 U.S. 374, 383, 98 S.Ct. 673, 679, 54 L.Ed.2d 618. (1978)). In *Wright,* the Sixth Circuit first concluded that because defendant's "nepotism policy does not directly and substantially interfere with the fundamental right to marry," it was subject to rational basis scrutiny. *Id.* at 1135–1136. In *Wright,* the defendant argued that its nepotism policy was necessary to:

> (1) avoid potential conflicts that might arise when two closely related persons allow their personal lives to impinge on their professional lives, and (2) prevent morale among other workers from deteriorating due to the unique relationship between the married co-workers.

*Id.* The Court concluded that "these reasons provide a rational basis for [defendant's] nepotism policy that furthers a legitimate governmental interest." *Id.* (citing *Parks v. City of Warner Robins, Georgia,* 43 F.3d 609, 615 (11th Cir.1995)) (upholding under rational basis scrutiny an anti-nepotism policy as a means of "avoiding conflicts of interests between work-related and family-related obligations; reducing favoritism or even the appearance of favoritism, preventing family on facts from affecting the workplace; and, by limiting inter-office dating, decreasing the likelihood of sexual harassment in the workplace"); *Parsons v. County of Del Norte,* 728 F.2d 1234, 1237 (9th Cir.1984) (holding that an anti-nepotism statute. is rationally related to the government interests of avoiding conflicts of interest and favoritism) *cert. denied,* 469 U.S. 846, 105 S.Ct. 158, 83 L.Ed.2d 95 (1984); *Cutts v. Fowler,* 692 F.2d 138, 141 (D.C.Cir.1982) (holding that the burden on the right to marry caused by anti-nepotism rules is "attenuated and indirect").

The Sixth Circuit recently reached the same conclusion in upholding a school's anti-nepotism policy. *See Montgomery v. Carr,* 101 F.3d 1117 (6th Cir.1996). The court concluded that the policy did not violate a teacher's First Amendment right to freedom of association because the policy was rationally related to legitimate goals, including avoiding friction if a marriage broke down, cutting down on social fraternization, promoting collegiality among teachers and easing the task of managing teachers. *See also Christoffersen,* 855 F.2d at 1441, 1443 (holding that a guardsman's First Amendment rights to free speech are outweighed by a state's strong interest in promoting the efficiency of the military services it provides through the National Guard, noting also that "there is no way judicial review could be limited to consideration of [plaintiffs'] First

---

9. *See Johnson v. Orr,* 780 F.2d 386, 389–393 (3rd Cir.1986) (after detailed analysis that reviewed the legislative history of the National Guard Technicians Act of 1968, the Court concluded that notwithstanding the National Guard's unusual hybrid status as an agency with both federal and state characteristics and that state adjutant general acted as a federal agent and exercised authority pursuant to federal regulations in dismissing federal technicians, the

NGTA left the Guard's administrative authority largely at state level and therefore for purposes of a § 1983 claim, Guard officials "acted under color of state law" in participating in personnel decisions against plaintiffs).

10. Or, as in the case of federal employees such as plaintiff, the due process clause of the Fifth Amendment.

Amendment claim ... "without exposing itself to all the pros and cons of nonretention decisions.)

These cases make clear that plaintiff does not have either a First Amendment or Fifth Amendment right to be free of anti-nepotism policies under the U.S. Constitution.

### 3. Plaintiff's 14th Amendment Claims

Citing the 14th Amendment, plaintiff contends defendants deprived him of his "federal right to continued tenure in the Air National Guard of the United States, a reserve component of the U.S. Air force, and as a federal civilian technician employee pursuant to 32 U.S.C. § 709" without procedural due process in violation of the 14th Amendment. However, as the Ninth Circuit ruled in *Christoffersen*, plaintiff has "no constitutionally protected property interest in continued employment" with the National Guard. *Christoffersen*, 855 F.2d at 1443. As that court concluded:

> Appellants' reliance on the National Guard Technicians Act, which simply allows but does not require the retention of qualified technicians, is misplaced. The Act is directed to the Secretary of the Air Force and does not purport to limit the role of state National Guards in making retirement decisions. See 10 U.S.C. §§ 8848(c), 8851(c). Similarly, the fact that ANGR 36–06 directs an Advisory Board to consider an officer's status as a civilian technician in making a recommendation to the Adjutant General does not support appellants' due process claim. See *Navas*, 752 F.2d at 768 (regulation only creates a property interest if it explicitly or implicitly gives rise to an entitlement to continued employment).

*Id.* As plaintiff's own complaint clearly acknowledged, plaintiff did not have a protected liberty interest in his continued employment as a federal technician because he was subject to the annual decision of the state adjutant general on whether to retain plaintiff in the Air National Guard of the United States. The Air National Guard regulations "give these military personnel essentially unlimited discretion in making nonretention decisions." *Christoffersen*, 855 F.2d at 1444.

 Plaintiff also appears to argue that defendants' actions violated his 14th Amendment right to equal protection under the laws. But as plaintiff has utterly failed to demonstrate how he has been treated differently than similarly situated employees, in this case fellow base commanders whose spouses worked under their command, (*see* n. 3, *supra.*), this claim also fails.

### 4. State Constitutional Claims

 Plaintiff has failed to cite any Michigan case establishing that he has a right under the *Michigan Constitution's* equal protection and due process guarantees to be free from anti-nepotism policies. In *Smith v. Department of Public Health*, 428 Mich. 540, 631, 410 N.W.2d 749 (1987), the Michigan Supreme Court refused to recognize the right of individuals to 'sue the state for damages for violations of the state constitution' holding that: "We defer to the Legislature's unique capacity to weigh the competing policy considerations implicated in creating such a damages remedy." As the Court has already concluded that plaintiff has not made a claim for relief under ELCRA or under the Federal constitution, plaintiff's claim for damages under the state Constitution also fails to state a claim upon which relief can be granted.

### V. Plaintiff's APA Claim

Having concluded that plaintiff has failed to state a claim with regard to Counts I, II and IV, the Court now addresses plaintiff's remaining claim: that defendant, state Department of Military Affairs, failed to follow the dictates of the Michigan Administrative Procedures Act, ("MAPA"), M.C.L. § 24.201 *et seq.* Without reaching the merits of defendants' arguments on several threshold issues, the Court acknowledges that it is very doubtful whether plaintiff, having already retired from the Michigan National Guard, has standing to bring this claim, and whether this Court has jurisdiction under the Eleventh Amendment to hear it. Putting aside those rather significant hurdles to plaintiff's third count, plaintiff's claim on this issue suffers from an even more basic defect.

Plaintiff's main contention can be best summarized as follows: As state of Michigan employees, defendants Stump and Seely had no authority under Michigan law to carry out any employment actions against plaintiff, a federal employee; but more importantly even if they had such authority, they adopted their own unwritten anti-nepotism policy without following the dictates of MAPA and its requirements for how such state policies must be formally promulgated under state law.

 Plaintiff's theory falters by ignoring one crucial fact. Defendants Stump and Seely were not acting pursuant to state law, but rather pursuant to federal law,[11] when they allegedly forced plaintiff to retire. In enacting the National Guard Technicians Act ("NGTA") of 1968, 32 U.S.C. § 709, Congress explicitly delegated to each state's adjutant general the legal authority to make retention decisions affecting certain federal National Guard employees, such as plaintiff.[12] The legislative history of the NGTA reveals that among "Congress' stated goals in passing the Act," one was "to recognize the military requirements and the State characteristics of the National Guard by providing for certain statutory administrative authority at the state level with respect to the technician program." *Johnson v. Orr*, 780 F.2d 386, 391 (3rd Cir.1986)(quoting H.R.Rep. No. 1823, 90th Cong.2d Sess. (1968) reprinted in 1968 U.S.Code Cong. & Ad. News 3318, 3319). Under the Supremacy Clause to the U.S. Constitution, the actions of a military official acting pursuant to federal law, in this case 32 U.S.C. § 709, cannot be challenged on the grounds that the officer's actions also failed to comply with state law.[13] Since defendants Stump and Seely acted pursuant to federal law, there was obviously no obligation for them to adopt an anti-nepotism policy in conformity with MAPA.

The Court therefore holds that even in the unlikely event plaintiff was to convince this Court that he had standing to challenge future actions of the Department of Military Affairs with regard to MAPA, the department's director and assistant director when acting pursuant to federal law need not follow MAPA. As a result, plaintiff has failed to state a claim for valid legal relief with respect to Count III.

## VI. Conclusion

Having thus concluded that plaintiff's claims are either non-justiciable, or in the alternative, fail to establish valid constitutional or statutory claims for marital status discrimination, defendants' motion to dismiss under Fed.R.Civ.P. 12(b)(6) is granted. Plaintiff's complaint is dismissed with prejudice and judgment is awarded to defendants. An order consistent with this opinion shall issue forthwith.

**11.** "The adjutant general's authority to dismiss technicians must be exercised pursuant to federal regulations." *Johnson v. Orr*, 780 F.2d 386, 393 (3rd Cir.1986).

**12.** As the Ninth Circuit explained in *Mier v. Owens*, 57 F.3d 747, 749 (9th Cir.1995) (holding that while Title VII applies to National Guard technicians, except when they challenge personnel actions integrally related to the military's unique structure):

The NGTA sets forth these employment rules for Guard technicians including the following: 1) If a Guard technician's job requires Guard membership, severance from the Guard requires severance from the technician's job; and 2) a technician who fails to meet military security standards can be severed from both the Guard and the technician job. 32 U.S.C. § 709(e)(1)-(2). These rules neither indicate that Title VII is applicable, nor preclude Title VII coverage. These rules merely indicate that the Guard technician job is dual-status.

**13.** Throughout his pleadings and briefs, plaintiff repeatedly contends that defendants Stump and Seely did not have authority under state law to do what they did. Plaintiff's contentions, however, fail to grasp the unique nature of "the National Guard's hybrid status." *Johnson*, 780 F.2d at 390. This case presents the unique situation in which two state military leaders took their action pursuant to the authority granted them under federal law. Plaintiff's oversight explains why he is unable to find any source of state legal authority for the action defendants took in allegedly forcing plaintiff to retire.