In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 18-1865

AMY HARNISHFEGER,

*Plaintiff-Appellant,*

*v.*

UNITED STATES OF AMERICA, *et al.*,

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:16-cv-03035-TWP-DLP — **Tanya Walton Pratt**, *Judge.*

_____

ARGUED NOVEMBER 28, 2018 — DECIDED DECEMBER 3, 2019

_____

Before ROVNER, HAMILTON, and BRENNAN, *Circuit Judges.*

HAMILTON, *Circuit Judge.* This appeal deals with First Amendment protection for public employees when they engage in speech that is not related or tied to their work. Plaintiff Amy Harnishfeger authored a short book, published under a pseudonym, about her time as a phone-sex operator called *Conversations with Monsters: 5 Chilling, Depraved and Deviant Phone Sex Conversations*. A month after publishing *Conversations*, Harnishfeger began what was to have been a one-year

stint with the Indiana Army National Guard as a member of
the Volunteers in Service to America (VISTA) program, a fed-
eral antipoverty program administered by the Corporation
for National and Community Service (CNCS).

But when Harnishfeger's National Guard supervisor dis-
covered *Conversations* and identified Harnishfeger as its au-
thor, she demanded that CNCS remove Harnishfeger from
her position. CNCS complied. Harnishfeger was unable to
find another suitable placement for the remainder of her
VISTA service, so, three months after she started, CNCS cut
her from the program entirely. Harnishfeger filed this suit al-
leging violations of her rights under the First Amendment
and the Administrative Procedure Act (APA). The district
court granted the defendants' motions for summary judg-
ment. *Harnishfeger v. United States*, 2018 WL 1532691 (S.D. Ind.
March 29, 2018). Harnishfeger appeals.

We reverse in part and affirm in part. *Conversations with
Monsters* is clearly protected speech, and on this record, a jury
could find that Harnishfeger's National Guard supervisor,
Lieutenant Colonel Lisa Kopczynski, infringed her free-
speech rights by removing her from her placement because of
it. We find no basis, however, for holding CNCS or its em-
ployees liable, so we affirm the judgment in favor of the fed-
eral defendants.

I.  *Factual Background*

   A.  *Conversations with Monsters*

Because this appeal is from a grant of summary judgment,
we state the facts and the inferences from them in the light
most favorable to Harnishfeger. A little more than a decade
ago,  Harnishfeger   found   herself   unemployed   and

"disgruntled with the thought of working for 'the man' any longer," as she wrote in the introduction to *Conversations*. She decided to try phone-sex work, but quickly discovered it was not the "flirty fun" the phone-sex industry held it out to be. Harnishfeger was horrified to hear what some of the callers would fantasize to her about, including sexual abuse of children.

These "vile, unrepentant, disgusting poor excuses for men" (and one woman) are the "monsters" of whom she wrote in *Conversations*. Harnishfeger did not mince words: "if you're getting off at the thought of hurting a child . . . , there is something clearly unfit for this world in you and you need to end things once and for all." *Conversations* recounted five of Harnishfeger's most horrifying phone-sex calls and meditated on the social role of phone-sex operators and on her own experiences as one of them.

Harnishfeger published *Conversations with Monsters* in May 2016 by making it available for sale in electronic form on Amazon, an online marketplace. On June 2, 2016 Harnishfeger announced publication of her book on her page on Facebook, a social networking website, with a link to the book's page on Amazon. Harnishfeger's Facebook page was "set to private," meaning that only Facebook users whom Harnishfeger designated as her "friends" could view what she posted there. Others viewing Harnishfeger's Facebook page would see only very general information about her.

Because *Conversations* was published pseudonymously, only Harnishfeger's Facebook "friends" could tie her to it. Even they, however, would have had to do a bit of hunting to find a reference to it unless they had seen the publication announcement soon after it was posted. A Facebook user's posts

appear on her page chronologically from most recent to least recent, so Harnishfeger's "quite frequent" Facebook activity would have buried the publication announcement under flurries of more recent posts "as little as a week or two" after it was made.

B. *VISTA*

Shortly after publishing *Conversations with Monsters*, Harnishfeger was selected to participate in the VISTA program. The VISTA program is a part of AmeriCorps, a federal network of hundreds of programs across the nation. It is sometimes called "the domestic Peace Corps." VISTA members serve full-time for a year at non-profit organizations or local government agencies to help them carry out programs to alleviate poverty. AmeriCorps is administered by CNCS, a federal agency that leads service, volunteering, and grant-making efforts in the United States.[1]

Prospective VISTA members apply directly to CNCS. If selected to participate in the program, members apply separately to work with a sponsoring organization pre-approved by CNCS. In Indiana, for example, the twenty-three organizations approved for VISTA sponsorship in 2016 included various charities, the Indianapolis Public Schools, and the Indiana Army National Guard. VISTA members/volunteers do not

---

[1] See AmeriCorps FAQs, CNCS, https://www.national-service.gov/programs/americorps/americorps-faqs (last visited Dec. 3, 2019); AmeriCorps VISTA FAQs, CNCS, https://nationalservice.gov/programs/americorps/americorps-programs/americorps-vista/americorps-vista-faqs (last visited Dec. 3, 2019); About CNCS, https://www.national-service.gov/about (last visited Dec. 3, 2019).

receive a salary, but they do receive a number of benefits, including a small monthly living allowance.

C. *Harnishfeger's Short VISTA Career*

Harnishfeger had applied to and been accepted by CNCS as a VISTA volunteer sponsored by the Indiana Army National Guard. She began her VISTA service with the Guard's Family Program Office in Indianapolis on June 24, 2016. Harnishfeger was responsible for maintaining a database of information on service providers to whom veterans and their families could turn for help. Much of the underlying information had already been gathered by the Guard's previous VISTA volunteer. If it had not been, Harnishfeger would glean the information herself from public sources. She would then enter it into the database. The information was made publicly available on the Guard's website.

Occasionally—perhaps a dozen times over the course of three months—Harnishfeger was unable to find an item of information she needed, such as a service provider's telephone number or physical address. In those cases, Harnishfeger contacted the service provider directly, usually by telephone or email.

In two cases, Harnishfeger could find no contact information for the service provider at all, so, using her own Facebook account, she posted a comment to the provider's Facebook page asking for the information she needed. For example, on August 26, she posted a message to the Facebook page of an organization called PACT—Hoosier Hills asking for an office email address. The comment identified Harnishfeger as a "VISTA volunteer."

To post these comments requesting information, Harnishfeger was not required to, and did not, designate the service providers as her Facebook "friends." Because her Facebook account was private, neither the provider's Facebook account manager nor any other members of the public viewing her comments were able to view Harnishfeger's posts to her own Facebook page, including her earlier post about *Conversations*.

During her three months of VISTA service with the Guard, these dozen contacts were the only occasions on which Harnishfeger interacted with members of the public on the Guard's behalf. Otherwise, she sat at a computer and entered data. She performed her duties to the Guard's satisfaction.

D. *Harnishfeger's Termination from VISTA*

That likely would have been the story of Harnishfeger's entire year with the Guard. But then Noelle Butler, Harnishfeger's direct supervisor, asked to become her Facebook "friend." Harnishfeger felt she could not reject this request from her quasi-employer. She accepted Butler's "friend request" and thereby gave Butler access to all of her "friends-only" Facebook activity.

In mid- to late September, Butler explored Harnishfeger's Facebook history deeply enough—through "many dozens, if not hundreds" of posts—to come upon her post of June 2 announcing the publication of *Conversations with Monsters*. Over her lunch break one day, "[o]ut of curiosity about this bizarre title," Butler and another Guard employee followed the Amazon link and purchased a copy of the book. On September 27, Butler and the other employee brought the book's contents to the attention of Lieutenant Colonel Lisa Kopczynski, the Guard's State Family Program Director.

On September 28, Lt. Col. Kopczynski wrote a letter to Emily Kubiszewski, a State Program Officer for CNCS who was Harnishfeger's point of contact with the VISTA program. Kopczynski requested that Harnishfeger be removed from the VISTA placement or be terminated early for cause. Referring to *Conversations*, Kopczynski explained that "activities and conduct found" on Harnishfeger's Facebook page did not "favorably represent" the Guard's Family Program Office.

The next day, September 29, Harnishfeger met with Butler and Kopczynski. Kopczynski told her that *Conversations with Monsters* was "really horrible," that she was not presenting the Guard "in a favorable light," and that the Guard could not "have anyone find out about" her authorship of *Conversations*. Harnishfeger would therefore be removed from her VISTA placement with the Guard.

The same day, Harnishfeger received a letter from Louis Lopez, Indiana State Program Director for CNCS, informing her that she had been removed from her VISTA placement and put on "Administrative Hold status" for up to 30 days, effective immediately. A week or so later, in early October, Kubiszewski told Harnishfeger that, although she would not be readmitted to her placement with the Guard, if she deactivated her Facebook account, she would be permitted to seek another sponsor where she could complete her term of VISTA service. Harnishfeger accordingly deactivated her account.

On October 6, Kubiszewski sent Harnishfeger a letter spelling out her prospects with the VISTA program. She gave Harnishfeger a list of approved VISTA sponsors in Indiana and nineteen days, until October 25, to find a new sponsor. If Harnishfeger could not secure reassignment before October

25, her VISTA participation would be terminated entirely, effective October 26.

Harnishfeger contacted five of the twenty-two potential sponsors available to her. One responded, but it was too far from Indianapolis to be feasible on Harnishfeger's limited means. Harnishfeger thus failed to secure reassignment by the October 25 deadline. On that day, she received a second letter from Lopez informing her that her VISTA membership had been finally terminated "for lack of suitable assignment."

E. *This Lawsuit*

Within two weeks, Harnishfeger sued Lopez, Kubiszewski, Kopczynski, and Butler in their personal and official capacities, as well as the United States government, for violating her rights under the First and Fourteenth Amendments and the Administrative Procedure Act, 5 U.S.C. § 706. The district court had jurisdiction of the case under 28 U.S.C. § 1331 and § 1346.

The personal-capacity defendants (except Butler, who was later dismissed on Harnishfeger's motion) moved to dismiss the complaint. The United States, as a named defendant and as the real target of official-capacity claims against federal actors, *Hafer v. Melo*, 502 U.S. 21, 25–26 (1991), moved separately to dismiss the complaint or in the alternative for summary judgment. After converting the defendants' motions to dismiss to motions for summary judgment, see Fed. R. Civ. P. 12(d), the district court granted the defendants' motions and entered final judgment in the defendants' favor.

II. *Analysis*

Because the district court converted the defendants' motions to dismiss to motions for summary judgment, we apply

the standard of review for grants of summary judgment. *Washington v. Summerville*, 127 F.3d 552, 557 (7th Cir. 1997). On the record before us, a reasonable jury could conclude that Lieutenant Colonel Kopczynski violated Harnishfeger's constitutional rights. Harnishfeger has a claim under 42 U.S.C. § 1983 against Kopczynski as a state actor, and Kopczynski is not entitled to qualified immunity. We therefore reverse the judgment as to Kopczynski. By contrast, Harnishfeger failed to show a triable issue as to whether any federal defendant is responsible for a violation of her rights under the First Amendment or the APA. We affirm the judgment in their favor.

A. *First Amendment Claim Against Lt. Col. Kopczynski*

1. *First Amendment Merits*

We begin with the First Amendment merits before turning to questions of Lieutenant Colonel Kopczynski's personal liability. To prove a First Amendment retaliation claim, a public employee must establish three elements: first, that she engaged in constitutionally protected speech; second, that she suffered a deprivation likely to deter protected speech; and third, that her protected speech was a motivating factor in the deprivation and ultimately, if the public employer cannot show it would have inflicted the deprivation anyway, its but-for cause. See *Graber v. Clarke*, 763 F.3d 888, 894–95 (7th Cir. 2014); *Greene v. Doruff*, 660 F.3d 975, 977–80 (7th Cir. 2011) (collecting causation cases); *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006). The first element—constitutionally protected speech— is the nub of this appeal; the second and third are uncontested as to Kopczynski.

Whether a public employee's speech is constitutionally protected is a question of law, "even though it may . . . require[] predicate factual determinations." *Gustafson v. Jones*, 290 F.3d 895, 906 (7th Cir. 2002). For clarity, we note that "constitutionally protected speech" has two different meanings in the doctrine. A public employee ultimately satisfies the protected-speech element of a retaliation claim by prevailing in the balance of employee and employer interests required by *Pickering v. Board of Education*, 391 U.S. 563 (1968). Our discussion immediately below focuses on the threshold question whether Harnishfeger's speech was constitutionally protected in the sense that the court needs to engage in *Pickering* balancing at all. We conclude that *Conversations with Monsters* was protected in both senses.

a.  *Conversations Is Protected Under NTEU*

There are at least two routes to *Pickering* balancing. See *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004). The better traveled leads across the double threshold established by *Connick v. Myers*, 461 U.S. 138 (1983), and *Garcetti v. Ceballos*, 547 U.S. 410 (2006). The employee must show under *Garcetti* that she spoke as a citizen rather than an employee, 547 U.S. at 418, and under *Connick* that she spoke on a matter of public concern rather than "matters only of personal interest." 461 U.S. at 147.

When the employee's speech is neither at work nor about work, however, a different path to *Pickering* is available under *United States v. National Treasury Employees Union*, 513 U.S. 454 (1995) ("*NTEU*"), largely anticipated in this circuit by *Eberhardt v. O'Malley*, 17 F.3d 1023 (7th Cir. 1994). In *NTEU*, the Court struck down a federal law that prohibited federal employees from receiving honoraria for writing and speaking on

matters unrelated to their official duties. The *NTEU* record included examples such as a mail handler who was paid for lecturing on Quaker history, an aerospace engineer who was paid for lecturing on African American history, and a biologist who earned money by writing and speaking about dance performances. 513 U.S. at 461. Justice Stevens's opinion for the Court also reminded readers that authors Nathaniel Hawthorne, Herman Melville, Walt Whitman, and Bret Harte had all published (and been paid for) their famous works while employed by various federal agencies. *Id*. at 464–65.

The key issues under *NTEU* are whether the employee's speech is "made outside the workplace," *id.* at 466; "involve[s] content largely unrelated to [her] government employment," *id.*; and is "addressed to a public audience," *id.*, or, what amounts to the same thing, involves "any matter for which there is potentially a public." *Eberhardt*, 17 F.3d at 1026 (rejecting pre- and post-publication distinction). If the employee shows these elements, and if the employer cannot show the employee's speech was linked by her "deliberate steps" to the employer's mission, purpose, or image, see *Roe*, 543 U.S. at 81, then *NTEU*, not *Connick*, controls, and *Pickering* balancing applies.

While *Conversations* may satisfy *Connick* as citizen speech on a matter of public concern, *NTEU* offers the easier and clearer path to decision. Harnishfeger's book was written and published a month before she began her VISTA service. Its content is entirely unrelated to CNCS, VISTA, and the Guard. It was written for a general audience on the personal experiences of sex workers and their social role, matters for which there is undoubtedly a public. Harnishfeger never

deliberately linked the book to her VISTA service, which had not even begun at the time of publication.

Defendants try to distinguish *NTEU* by citing *Roe* and our decision in *Craig v. Rich Township High School District 227*, 736 F.3d 1110 (7th Cir. 2013), arguing that Harnishfeger deliberately linked *Conversations with Monsters* to her VISTA service by "promoting [the book] on her Facebook page, where she held herself out as an employee of the Indiana National Guard and which she used to contact local family-services organizations on behalf of the Guard." This argument distorts the record and fails to give plaintiff the benefit of conflicting evidence and favorable inferences from the evidence.

The plaintiff in *Roe* was a San Diego police officer who sold videos of himself on an online marketplace, stripping and masturbating in a police uniform and pantomiming police work. 543 U.S. at 78–79. He sold these and other items, including official San Diego police uniforms, under a user name that was "a wordplay on a high priority police radio call," while identifying himself as employed in the field of law enforcement. *Id.* For these actions and for failing to comply with a resulting investigation by his employer, Roe was fired. He sued, alleging his firing violated the First Amendment. *Id.* at 79.

The Court concluded, summarily and unanimously, that the firing was permissible under either *NTEU* or *Connick*. *Id.* at 80. "In *NTEU* it was established that the speech was unrelated to the employment and had no effect on the mission and purpose of the employer." *Id.* By contrast, although Roe's expression "purported to be" unrelated to his employment, Roe himself had taken "deliberate steps to link his videos . . . to his police work, all in a way injurious to his employer." *Id.* at

81. The Court pointed to his use of a police uniform in his performances, his allusive user name, his disclosure of law-enforcement employment, and his "debased parody of an officer performing indecent acts while in the course of official duties" in finding that Roe's expression "brought the mission of the employer and the professionalism of its officers into serious disrepute." *Id.* Put differently, "Roe's expression was widely broadcast, linked to his official status as a police officer, and designed to exploit his employer's image." *Id.* at 84.

Similar linkage was critical in *Craig*, where the plaintiff was a former high school guidance counselor and girls' basketball coach who had been fired from those positions for writing a book called *It's Her Fault*, a "hypersexualized" tract dedicated to the proposition that, when men and women experience difficulties in romantic relationships, "it's her fault." 736 F.3d at 1113–14. Affirming the district court's dismissal of his complaint, we rejected Craig's argument that his book was protected under *NTEU*.

Craig had taken "'deliberate steps to link' his book with his work as a guidance counselor . . . ." *Id.* at 1118, quoting *Roe*, 543 U.S. at 81. Craig's book cited his work as a counselor and coach as the basis for his claimed expertise; thanked his "students and clients" in the acknowledgments; contained a foreword written by a teacher at Craig's school; and described the counseling Craig had provided "to thousands of students, parents, clients, and friends." *Id.* We held this material reflected "Craig's conscious choice to connect 'It's Her Fault' to his counseling position," taking his book outside *NTEU*'s protection. *Id.*

The point of *Roe* and *Craig* is that the speaker-employee cannot deliberately trade on her public employment while

claiming the speech is entirely unrelated. But *NTEU* would mean little indeed if its protection could be circumvented by merely identifying an author as a public employee. (Recall that Butler had to canvass "many dozens, if not hundreds" of Harnishfeger's Facebook posts to find the *Conversations* publication announcement.) And simply nothing at all in *Conversations* or its distribution is deliberately linked to the mission, purpose, or image of the Indiana Army National Guard or the VISTA program.

*Conversations* was speech on a matter of public concern within the meaning of *NTEU*, and Harnishfeger is therefore entitled to *Pickering* balancing. The district court erred in reaching the contrary conclusion. That is not enough to resolve this appeal, however, as the district court ruled in the alternative that, even assuming *Conversations* was constitutionally protected in the threshold sense, the *Pickering* balance weighed in the defendants' favor. This ruling, too, was erroneous.

b. *The Pickering Balance Does Not Weigh in the Defendants' Favor*

The challenge in public-employee speech doctrine is "to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. In deciding whether the balance should be struck in favor of speech or efficiency in a given case, we have examined seven factors:

> (1) whether the speech would create problems
> in maintaining discipline or harmony among

> co-workers; (2) whether the employment rela-
> tionship is one in which personal loyalty and
> confidence are necessary; (3) whether the
> speech impeded the employee's ability to per-
> form her responsibilities; (4) the time, place and
> manner of the speech; (5) the context in which
> the underlying dispute arose; (6) whether the
> matter was one on which debate was vital to in-
> formed decisionmaking; and (7) whether the
> speaker should be regarded as a member of the
> general public.

*Kristofek v. Village of Orland Hills*, 832 F.3d 785, 796 (7th Cir. 2016), quoting *Greer v. Amesqua*, 212 F.3d 358, 371 (7th Cir. 2000). We need not address each factor in each case. *Id.*, citing *Graber v. Clarke*, 763 F.3d 888, 896 (7th Cir. 2014).

At trial, the public employer has the burden of showing by a preponderance of the evidence that this balance weighs in its favor. *Gustafson v. Jones*, 290 F.3d 895, 906, 909 (7th Cir. 2002). Requiring proof by a preponderance of the evidence indicates that the public employer's burden is one of persuasion, not merely production, in the nature of an affirmative defense. See *Gustafson v. Jones*, 117 F.3d 1015, 1019 (7th Cir. 1997) ("[P]urely as a matter of good pleading practice, we think it preferable to leave to the defendant the burden of raising justification [under *Pickering*] as an affirmative defense."); see generally *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57 (2005), citing *FTC v. Morton Salt Co.*, 334 U.S. 37, 44–45 (1948) ("[T]he burden of persuasion as to certain elements of a plaintiff's claim may be shifted to defendants, when such elements can fairly be characterized as affirmative defenses . . . .").

When a public employer moves for summary judgment on the *Pickering* balancing defense, therefore, it must "lay out the elements of the [defense], cite the facts which it believes satisf[y] these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant" on the defense." See *Hotel 71 Mezz Lender LLC v. Nat'l Retirement Fund*, 778 F.3d 593, 601 (7th Cir. 2015) (summary judgment standard where movant bears burden of proof on claim or defense). The district court did not hold the defendants to this standard, however.

On appeal, the defendants' defense of the district court's *Pickering* balance suffers from two general defects. First, through citations to websites and the "VISTA Member Handbook," they seek to defend the district court's decision based on facts that were not before that court. Contra, Fed. R. App. P. 10(a); *United States v. Elizalde-Adame*, 262 F.3d 637, 640 (7th Cir. 2001) ("[W]e still could not consider the claims because they are based on factual material outside of the record which was never presented to the district court."). We therefore decline to consider these materials.[2]

---

[2] In one unusual case, we reversed summary judgment in an opinion that discussed in detail factual materials drawn from the majority's own factual research, outside the appellate record. See *Rowe v. Gibson*, 798 F.3d 622 (7th Cir. 2015), rehearing en banc denied by equally divided court, 2015 WL 10767326 (7th Cir. 2015). The *Rowe* majority denied, however, that it based its decision on such research. 798 F.3d at 629, 630, 632; 2015 WL 10767326 at *1. The plaintiff's pro se status as a prisoner who had virtually no access to medical expertise was critical to the majority's unusual decision to carry out its own factual research. *Id*. at 629–30. By contrast, in this opinion we have cited several government websites only for general background and context about the VISTA program, not for material facts. See *supra* at 4 n.1.

Second, the defendants offer justifications for Harnish-feger's termination that Kopczynski *might* have considered at the time but for which there is no actual evidence. "*Pickering* balancing is not an exercise in judicial speculation." *Gustafson*, 290 F.3d at 909. More specifically, *Pickering* balancing "is not like 'rational basis' review . . . , under which it is enough to imagine any rational underpinning" for a challenged govern-ment action. *Id.* at 909–10. "First Amendment rights cannot be trampled based on hypothetical concerns that a governmental employer never expressed." *Id.* at 910. A court must look in-stead to what the public employer's concerns "really were." *Id.* at 909; cf. *Craig*, 736 F.3d at 1115, 1119–21 (on motion to dismiss, reviewing public employer's "list of Charges" and "Bill of Particulars" attached to complaint as "adequate basis" on which to perform *Pickering* balancing).

On this record, the only evidence of the defendants' actual concerns with *Conversations* is Kopczynski's September 28, 2016 letter to Kubiszewski requesting Harnishfeger's removal from her Guard assignment, supported by Harnishfeger's re-port of her September 29, 2016 meeting with Kopczynski and Butler. Kopczynski's letter disclosed one overriding concern: that *Conversations* and Harnishfeger's June 2, 2016 Facebook post announcing its publication "substantially diminishe[d]" Harnishfeger's "effectiveness as an AmeriCorps VISTA mem-ber."

The letter suggests two reasons for that conclusion: first, that "activities and conduct found on Amy's social media Fa-cebook account . . . do not favorably represent our Family Program Office or its core programs," and again that "[t]hese public displays on social media do not reflect a positive image for our organization"; and second, that "[t]his posting and its

content do not create a culture that reduces violent behavior within the ranks or emphasizes and encourages help-seeking behaviors" and are "in direct contrast with the Indiana National Guard's Domestic Violence Prevention and Response Plan."

Harnishfeger's report of the September 29 meeting is consistent with the September 28 letter, except that on September 29 there was apparently no mention of "help-seeking behaviors" or the Guard's "Domestic Violence Prevention and Response Plan." According to Harnishfeger, in their meeting Kopczynski said that *Conversations* was "really horrible," that Harnishfeger was not presenting the Guard "in a favorable light," and that the Guard could not "have anyone find out" that Harnishfeger had written it.

Kopczynski's first reason for doubting Harnishfeger's effectiveness was that *Conversations* reflected poorly on the Guard. But there is no evidence or reasonable inference that it had done so or would do so—certainly not to an extent that would risk compromising the Guard's mission, a prospect Kopczynski's letter did not even raise. "The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails." *Rankin v. McPherson*, 483 U.S. 378, 390 (1987). Harnishfeger's responsibilities with the Guard were so routine and clerical that she could not be viewed by a reasonable member of the public as speaking for the Guard on any matter, beyond her occasional collection of telephone numbers and email addresses from veterans' service providers.

In this respect, Harnishfeger is much like the clerical law-enforcement employee in *Rankin*. She was fired from that role (impermissibly, as the Court held) for saying, in a private

conversation with a colleague at work about a recent attempt on President Reagan's life, that "if they go for him again, I hope they get him." 483 U.S. at 381. Notwithstanding the general proposition that approving of murder may cast doubt on a person's suitability for a career in law enforcement, see *id.* at 390, the Court rejected the suggestion that "every employee in Constable Rankin's office, whether computer operator, electrician, or file clerk, is equally required, on pain of discharge, to avoid any statement susceptible of being interpreted" as an indication of unsuitability for promoting the public employer's ultimate law-enforcement mission. *Id.* at 391.

On this point, the Court contrasted the case with *McMullen v. Carson*, 754 F.2d 936 (11th Cir. 1985), which upheld the firing of a clerical employee in the Jacksonville, Florida, sheriff's office after the employee identified himself at a televised press conference as a recruiter for the Ku Klux Klan. *Rankin*, 483 U.S. at 391 n.18. In that case, "[t]he evidence [was] uncontradicted that Jacksonville's black community in large part would categorically distrust the Sheriff's office if a known Klan member were permitted to stay on in any position." *McMullen*, 754 F.2d at 939.

Our decision in *Craig* offers a useful comparison on this point as well. Emphasizing the "inordinate amount of trust and authority" conferred upon Craig by his role as a high school guidance counselor, 736 F.3d at 1119, we could "easily see how female students may feel uncomfortable seeking advice from Craig given his professed inability to refrain from sexualizing females" and indeed might have forgone "the school's counseling services entirely rather than take the risk that Craig would not view them as a person but instead as an

object." *Id.* at 1120. The school's interest in "ensur[ing] effective delivery of counseling services to female students" was squarely implicated, and immediately endangered, by Craig's speech. *Id.*

As in *Rankin*, and unlike *McMullen* and *Craig*, there is in Harnishfeger's case no evidence and no basis for believing that veterans or organizations serving them would distrust the Guard if the known author of a phone-sex memoir were permitted to collect and enter the organizations' contact information into a database on the Guard's behalf. That is all the more true of *Conversations* specifically, which disapproves sexual abuse of children in the strongest terms, describing those who fantasize about it as "monsters" who "need to end things once and for all." It "borders on the fanciful," see *Rankin*, 483 U.S. at 393 (Powell, J., concurring), to suggest, as defendants do here, that any member of the public could believe the Guard condoned sexual abuse of children because its VISTA volunteer authored *Conversations*.

It is in fact highly unlikely that *Conversations* could have reflected anything at all about the Guard, positive or negative. Only a single "private" Facebook post linked *Conversations* to Harnishfeger, and, as far as the record discloses with certainty, only two "public" Facebook posts linked Harnishfeger to the Guard. Harnishfeger's authorship of *Conversations* was uncovered only because Butler, the Guard's own employee, out of boredom or curiosity on her lunch break, went digging through "dozens, if not hundreds" of Harnishfeger's Facebook posts. She was able to do so only because—we must assume—Harnishfeger felt compelled to accept her supervisor's "friend" request. The reasonable inference in Harnishfeger's favor is that she would not have accepted "friend" requests

from any Guard employee who was not her supervisor, nor from anyone connected to the two service providers she contacted on Facebook on the Guard's behalf.

The district court weighed in defendants' favor the possibility that *Butler*, not Harnishfeger, would disrupt the Guard's mission by spreading knowledge of *Conversations*. We must disagree. Aside from the lack of evidence on this point, the government cannot be handed a "snooper's veto" when it uncovers otherwise secreted employee speech and then invokes the possibility that its own agents would publicize it. Cf. *Craig*, 736 F.3d at 1121 (recognizing that "heckler's veto" cannot be used to silence unpopular speech).

Kopczynski's second reason for doubting Harnishfeger's effectiveness was that her "posting and its content do not create a culture that reduces violent behavior within the ranks or emphasizes and encourages help-seeking behaviors" and are "in direct contrast with the Indiana National Guard's Domestic Violence Prevention and Response Plan." The district court did not address this ground, and the defendants do not attempt to defend it on appeal. *Conversations* neither promotes violence nor discourages victims of violence from seeking help.

In sum, the defendants' side of the *Pickering* balance is empty. The connection between the stated grounds for Harnishfeger's termination and the evidence before us is so tenuous as to support a reasonable inference that the former were mere pretexts for the feelings of embarrassment and disgust that *Conversations* undoubtedly—and intentionally, Harnishfeger points out—arouses in its readers. But a public employer may not "use authority over employees to silence discourse, not because it hampers public functions but simply

because superiors disagree with the content of employees' speech." *Rankin*, 483 U.S. at 384. The First Amendment prohibits such misuse of authority.

2. *Action Under Color of State Law*

Section 1983 offers a remedy for constitutional violations by persons acting under color of state law, not federal law. *Knutson v. Wis. Air Nat'l Guard*, 995 F.2d 765, 767 (7th Cir. 1993). Kopczynski contends that she acted here under federal law, not state. The district court did not address the issue, but the record is sufficient for us to address it as an alternative ground argued for affirming summary judgment.

"No set formula exists" for determining whether a particular governmental action is taken under color of state or federal law; our inquiry "focuses on the nature of that action and functional capacity of the actor." *Knutson*, 995 F.2d at 767, citing *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 399–400 (1979). The question arises with respect to the National Guard because, as the Supreme Court has explained, its members occupy a unique position in our federal structure:

> [In 1933, Congress] created the two overlapping but distinct organizations . . . —the National Guard of the various States and the National Guard of the United States. Since 1933 all persons who have enlisted in a State National Guard unit have simultaneously enlisted in the National Guard of the United States. In the latter capacity they became a part of the Enlisted Reserve Corps of the Army, but unless and until ordered to active duty in the Army, they

> retained their status as members of a separate
> State Guard unit.

*Perpich v. U.S. Dep't of Defense*, 496 U.S. 334, 345 (1990) (internal quotation marks omitted). Unless and until called into federal service, therefore, "[i]n each state the National Guard is a state agency, under state authority and control." *Knutson*, 995 F.2d at 767.

In *Knutson* we considered whether, in light of its "hybrid nature," the Wisconsin Air National Guard acted under color of state law for purposes of § 1983 in firing plaintiff Knutson. *Id.* Despite the web of state and federal laws and regulations governing National Guard service, at bottom Knutson's case "present[ed] the rather straightforward case of state officers exercising their state authority to effectuate the termination of state militia personnel." *Id.* at 768. There was no contention that Knutson's unit had been federalized at any relevant time, and the governor of Wisconsin otherwise served as the Guard's commander in chief. *Id.* Though federal law authorized the Guard's activity, governed much of its conduct, and subsidized the salaries of its officers and technicians, *id.* at 767, that did "not alter the state-law character of its actions." *Id.* at 768.

Similarly here, the Indiana Army National Guard was not federalized at any time relevant to this case. The governor of Indiana is the commander in chief of Indiana's National Guard units. Ind. Code § 10-16-6-4(a). Kopczynski's September 28, 2016 letter to Kubiszewski was on letterhead bearing Indiana's state seal and the emblem of the "Indiana Joint Forces Headquarters." All signs point to state action, not federal.

The defendants argue that *Knutson* does not control here, not because the Indiana Army National Guard is materially different from the Wisconsin Air National Guard, but because Harnishfeger was a member of a federal program when Kopczynski demanded her removal. The proper focus, however, is not on the target of the action but on the actor. *Knutson*, 995 F.2d at 767. The defense argument implies that any public or private VISTA sponsor (the Indianapolis Public Schools or a local Boys and Girls Club, for example) becomes a federal agent whenever it hosts a VISTA volunteer, a view we find untenable.

The defense points out that Harnishfeger's VISTA position was federally funded and subject in part to federal guidelines. But both factors were present in *Knutson* as well, see *id*. at 767 ("the federal government provides salaries, benefits, and supplies to full-time Guard officers and technicians"), 768 ("Wisconsin adopts and [defendant] opts to utilize federal substantive and procedural rules"), and that did not "alter the state-law character" of the Wisconsin Air National Guard's actions. *Id.* at 768.

In demanding Harnishfeger's removal from her VISTA placement, Lieutenant Colonel Kopczynski was a Guard officer exercising her supervisory authority over the Guard's Family Program Office for the Guard's benefit and in furtherance of the Guard's mission. That was action under color of state law, so § 1983 offers a remedy.

### 3. *Qualified Immunity*

Defendants also sought summary judgment on the defense of qualified immunity, arguing that Kopczynski did not violate clearly established constitutional law by demanding

Harnishfeger's removal. See generally, e.g., *Surita v. Hyde*, 665 F.3d 860, 868 (7th Cir. 2011), citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). It is "an undeniable fact about balancing tests," such as *Pickering*'s, "that they produce a wide gray area between the clearly legal and the clearly illegal, and the rules of qualified immunity require giving the benefit of the doubt to the reasonable public official if the particular case falls within that gray area." *Gustafson v. Jones*, 117 F.3d 1015, 1021 (7th Cir. 1997). "[G]overnment officials are not expected to be prescient and are not liable for damages simply because they legitimately but mistakenly believed that the balancing of interests tipped in the State's favor." *Gregorich v. Lund*, 54 F.3d 410, 415 (7th Cir. 1995).

No prescience is demanded, however, of the public employer who retaliates against protected speech "where the speech caused no actual disruption of any kind for four months, and where the employer neither articulates a belief that the speech has the potential to be disruptive in the future, nor has evidence to support the reasonableness of such a belief." *Gustafson v. Jones*, 290 F.3d 895, 913 (7th Cir. 2002) (rejecting defense of qualified immunity on appeal from verdict for plaintiffs). Substitute "three months" for "four months," and the observation applies here.

First, under clearly established law in September 2016, *Conversations* was protected. It was speech neither at work nor about work; it was addressed to a general audience; and there was no sign that Harnishfeger deliberately linked its content or message to the Guard's mission, purpose, or image. *City of San Diego v. Roe*, 543 U.S. 77, 80–82 (2004); *NTEU*, 513 U.S. 454, 466 (1995); *Eberhardt v. O'Malley*, 17 F.3d 1023, 1026–27 (7th Cir. 1994). Though we must take care not to define the right

asserted by Harnishfeger at too high a level of generality, see *Viilo v. Eyre*, 547 F.3d 707, 710 (7th Cir. 2008), citing *Brosseau v. Haugen*, 543 U.S. 194, 198–99 (2004), there is no real dispute on these points here.

Defendants argue that *Roe* and *Craig v. Rich Township High School District 227*, 736 F.3d 1110 (7th Cir. 2013), together suggest that sexually explicit speech "is generally not considered of public concern," but those cases suggest no such thing. *Roe* made clear that the plaintiff's sexualized performances would have been protected under *NTEU* but for his deliberate linkage of them to his police work. See 543 U.S. at 81 ("Although Roe's activities took place outside the workplace . . . ."). And Craig lost at the *Pickering* balancing step of the analysis, not the threshold step of whether his speech addressed a matter of public concern under *Connick*. See *Craig*, 736 F.3d at 1113, 1115–18.

Second, clearly established law in September 2016 held that the public employer's side of the *Pickering* balance must be supported with evidence of actual disruption, or at least the articulation of a reasonable belief in future disruption plus evidence of its reasonableness at the time. *Gustafson*, 290 F.3d at 913; see also *Hulbert v. Wilhelm*, 120 F.3d 648, 655 (7th Cir. 1997) (denying qualified immunity: "*Connick* reiterated *Pickering*'s rule that the mere incantation of the phrase 'internal harmony in the workplace' is not enough to carry the day, and the Pierce County defendants appeared to have relied on nothing more substantial than that."); *Dahm v. Flynn*, 60 F.3d 253, 258 (7th Cir. 1994) (reversing in part grant of qualified immunity defense: "Not only did Flynn fail to identify how Dahm's testimony impeded the efficient operations of the

Lottery, but the precise opposite would seem to have motivated the Wisconsin legislature to invite Dahm to testify[.]").

The *Pickering* analysis here shows no actual disruption; no articulation of a belief in future disruption with respect to Kopczynski's appeal that *Conversations* does not "favorably represent" the Guard; and no rational connection between Kopczynski's appeal to the Guard's Domestic Violence Prevention and Response Plan and *Conversations* or Harnishfeger's VISTA placement. On this record, the explanations provided appear to be so flimsy as to support an inference that they were not objectively reasonable but reflected only disgust with *Conversations* and its author, whom the Guard, as Kopczynski emphasized, "likely would not have considered" for VISTA placement had it been aware of her "previous employment/work experience." On this record, "the line between the permitted and the forbidden" was clearly "marked in advance." *Walsh v. Ward*, 991 F.2d 1344, 1346 (7th Cir. 1993). Kopczynski has not shown that she stayed within that line and is entitled to summary judgment based on qualified immunity.

## B. *Claims Against the Federal Defendants*

As for Harnishfeger's claims against Kubiszewski, Lopez, and the United States, we conclude she failed to show a triable issue on any federal defendant's personal participation in a constitutional violation and otherwise failed to show a triable issue on her APA claim. We therefore affirm the judgment in the federal defendants' favor.

### 1. *First Amendment Claim*

Causation, the third element of a public employee's First Amendment retaliation claim, is uncontested by the parties

on appeal, though it was disputed in the district court. The district court did not decide the issue, but we may affirm a grant of summary judgment on any basis in the record, "so long as that ground was adequately addressed in the district court and the nonmoving party had an opportunity to contest the issue." *Peretz v. Sims*, 662 F.3d 478, 480 (7th Cir. 2011), quoting *Cardoso v. Robert Bosch Corp.*, 427 F.3d 429, 432 (7th Cir. 2005). Here, Harnishfeger had and took the opportunity to contest the issue in the district court (indeed, she cross-moved for summary judgment on liability) and the lack of causation here is so clear-cut that we see no need to remand the issue for the district court to consider in the first instance.

"[T]o make out a prima facie case for retaliation at summary judgment," a public employee must bring forward evidence sufficient to permit a reasonable finding that her protected speech "was at least a motivating factor" of the public employer's speech-deterring deprivation. *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012). "Causation is a subject on which philosophers speak more clearly than lawyers." *Greene v. Doruff*, 660 F.3d 975, 978 (7th Cir. 2011). What the law calls a "motivating factor" in this context is a sufficient condition: the public employee at summary judgment must show that a reasonable jury could find her protected speech "was a sufficient condition of the harm" for which she seeks redress. *Id.* at 979.

If that showing is made, "the burden shifts to the employer to rebut the causal inference raised by [the employee's] evidence," *Kidwell*, 679 F.3d at 965, by showing that her protected speech "though a sufficient condition was not a necessary condition" of the employer's adverse action; "the harm . . . would have occurred anyway." *Greene*, 660 F.3d at 979. If

the employer fails, "the inference is that 'but for' causation (that is, a necessary condition) has been shown," and the employee prevails. *Id.*

Harnishfeger failed to carry her initial burden of offering evidence of causation as to the federal employees, Kubiszewski and Lopez. Kubiszewski was a State Program Officer for CNCS and Harnishfeger's point of contact with the VISTA program. A week or so after Lopez's September 29, 2016 letter to Harnishfeger informing her CNCS had placed her on administrative leave, Kubiszewski informed Harnishfeger that if she deactivated (more exactly, "took specific steps with respect to") her Facebook account, she would be permitted to seek another sponsoring organization. Harnishfeger then deactivated her Facebook account. On October 6, Kubiszewski sent Harnishfeger a list of approved VISTA sponsors in Indiana and told her she had nineteen days, until October 25, to find a new sponsor.

Lopez was the Indiana State Program Director for CNCS. On September 29, 2016 Lopez told Harnishfeger by letter that she had been removed from her VISTA placement and put on "Administrative Hold status for a period not to exceed 30 days," effective immediately. When Harnishfeger failed to secure a reassignment with another sponsoring organization by October 25, Lopez informed her by a second letter that her VISTA membership had been finally terminated "for lack of suitable assignment."

A governmental actor may be held personally liable only for constitutional violations in which she personally participated. *Ashcroft v. Iqbal*, 556 U.S. 662, 676–77 (2009) (*Bivens*); *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) (§ 1983). On the facts recited above, it is clear beyond genuine dispute

that neither Kubiszewski nor Lopez (with one exception) played any role in Harnishfeger's removal from her VISTA placement with the Guard.

The exception for Lopez arises from the regulations governing VISTA participation. Those regulations provide in relevant part that "CNCS has the sole authority to remove a VISTA from a project where . . . she has been assigned." 45 C.F.R. § 2556.405(a). However, a sponsoring organization "may request that CNCS remove a VISTA assigned to its project." § 2556.410(a). When such a request is made, "[t]he State Program Director *may, at his . . . discretion*, attempt to resolve the situation with the sponsor so that an alternative solution other than removal of the VISTA from the project assignment is reached." § 2556.410(b) (emphasis added). Otherwise, if an alternative solution "is not sought, or is not reached within a reasonable time period, the State Program Director *shall remove* the VISTA from the project." § 2556.410(c) (emphasis added).

As long as the Guard dug in its heels, as it did, it had the power to insist that Harnishfeger's term with it was over. Still, assuming without deciding that Lopez's failure to exercise his discretion to try to persuade the Guard to change its mind might have been actionable, Harnishfeger has failed to show that a jury could reasonably conclude *Conversations* explains Lopez's failure. There is no evidence that Lopez knew, even in a general way, what the content of *Conversations* was. Neither is there any evidence of Lopez's reaction to *Conversations* specifically or to any speech, offensive or not, by VISTA members generally. On this record, there is simply no indication that the content of *Conversations* influenced Lopez's decision

not to exercise his discretion to try to persuade the Guard to allow Harnishfeger to stay.

As for Harnishfeger's removal by CNCS from the VISTA program entirely, the constitutional violation at issue is her removal from her VISTA placement with the Guard. The *Pickering* balance makes no allowance here for the interests of CNCS regarding termination once the Guard ended Harnishfeger's VISTA term with it. In any event, as with Lopez's involvement in Harnishfeger's removal from her placement with the Guard, there is no non-speculative inference that *Conversations* explains Kubiszewski and Lopez's actions in removing Harnishfeger from the VISTA program. Again, there is no evidence Lopez had any material understanding of *Conversations* to begin with. More fundamentally, if one imagines *Conversations* being brought to the attention of Kubiszewski and Lopez directly, without mediation by Kopczynski's removal request, the record contains no reason to believe that either federal officer's reaction would have been adverse to its author—still less, adverse to such a degree that either would have been moved to seek Harnishfeger's removal from VISTA. Kubiszewski and Lopez are entitled to judgment as a matter of law.

### 2. *The APA Claim*

Under the federal Administrative Procedure Act, the target of an adverse final agency action may seek to have the action held unlawful and set aside by a reviewing court if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)–(B). The district court entered judgment in the defendants' favor on the APA claim because it concluded that no defendant had

violated Harnishfeger's constitutional rights and CNCS's decision to terminate Harnishfeger's VISTA participation for lack of suitable assignment was not arbitrary or unreasonable.

We agree that no federal defendant—Kubiszewski, Lopez, or the United States, which acted through them in this case—violated the Constitution. We have already explained why the record does not permit a reasonable inference that Kubiszewski or Lopez abridged Harnishfeger's free-speech rights: they did not personally participate in Lieutenant Colonel Kopczynski's decision to demand Harnishfeger's removal from her placement with the Guard; and Harnishfeger has not shown evidence that *Conversations* suffices to explain their decision to remove her from the VISTA program entirely.

For non-constitutional review of agency action, "we rely on the same administrative record that was before the district court and render an independent judgment as to whether the agency acted unreasonably." *Mittelstadt v. Perdue*, 913 F.3d 626, 633 (7th Cir. 2019), quoting *Stable Invs. P'ship v. Vilsack*, 775 F.3d 910, 915 (7th Cir. 2015). Our review is "deferential." *Id.*, quoting *St. Clair v. Sec'y of Navy*, 155 F.3d 848, 851 (7th Cir. 1998). Harnishfeger does not deny that she failed to secure reassignment after her removal from the Guard and that this failure motivated her "non-cause" termination from the VISTA program. She complains, however, of "numerous uniquely onerous conditions" on which her continued VISTA service was made to depend: the unsuitability or undesirability of the proffered alternative placements; the "cold calling" process to which she was relegated; and the requirement that any future sponsor speak with her Guard supervisors.

Undoubtedly, CNCS's course of proceeding put Harnishfeger in a less than ideal position to continue her VISTA

service. But non-ideal is not irrational. Harnishfeger's charge that the conditions of her continued participation were "uniquely onerous" is not supported by the record. True, the "cold calling" procedure differed from the initial sponsor-assignment process, but there is no evidence as to how CNCS usually proceeded in sponsor-*re*assignment cases. Without such evidence, we cannot say that it was arbitrary for CNCS to have failed to offer Harnishfeger more interesting or more convenient reassignment options, or to have permitted any prospective new sponsor to speak with Harnishfeger's former sponsor. Harnishfeger failed to show a genuine dispute as to her entitlement to relief under the APA. The federal defendants are therefore entitled to judgment as a matter of law.

The judgment in favor of all defendants but Kopczynski is AFFIRMED. The judgment in favor of Kopczynski is REVERSED and the case REMANDED for further proceedings consistent with this opinion.